1   SCHNEIDER WALLACE COTTRELL
       KONECKY  WOTKYNS LLP
2   MICHAEL C. MCKAY (SBN 023354)
    8501 North Scottsdale Road, Suite 270
3   Scottsdale, AZ 85253
    Telephone: (480) 428-0144
4   Facsimile: (866) 505-8036
    E-mail: mmckay@schneiderwallace.com
5
6   ROBBINS ARROYO LLP
    BRIAN J. ROBBINS
7   FELIPE J. ARROYO
    SHANE P. SANDERS
8   600 B Street, Suite 1900
    San Diego, CA  92101
9   Telephone: (619) 525-3990
    Facsimile: (619) 525-3991
10  E-mail: brobbins@robbinsarroyo.com
            farroyo@robbinsarroyo.com
11          ssanders@robbinsarroyo.com
12  Attorneys for Plaintiff
13              UNITED STATES DISTRICT COURT
14            FOR THE DISTRICT OF ARIZONA
15  ROBERT HUTTON, Derivatively on          Civil Action No.
    Behalf of INVENTURE FOODS, INC.,
16                                          VERIFIED STOCKHOLDER
               Plaintiff,                   DERIVATIVE COMPLAINT FOR
17                                          VIOLATION OF SECURITIES LAWS,
          v.                                BREACH OF FIDUCIARY DUTY,
18                                          WASTE OF CORPORATE ASSETS,
    TERRY MCDANIEL, STEVE                   AND UNJUST ENRICHMENT
19  WEINBERGER, TIMOTHY A. COLE,
    ASHTON D. ASENSIO, MACON BRYCE
20  EDMONSON, PAUL J. LAPADAT,
    HAROLD S. EDWARDS, DAVID L.
21  MEYERS, and ITZHAK REICHMAN,             UNDER SEAL
22             Defendants,
          -and-
23
    INVENTURE FOODS, INC., a Delaware
24  corporation,
25             Nominal Defendant.
                                            DEMAND FOR JURY TRIAL
26
27
28

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for Violation of Securities Laws, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment against the defendants named herein.  Plaintiff's allegations are based on, among other things: (i) documents produced by nominal defendant Inventure Foods, Inc. ("Inventure" or the "Company") in response to plaintiff's inspection demand; (ii) various inspections conducted by the U.S. Food and Drug Administration ("FDA") and the Georgia Department of Agriculture ("GDA"), and their subsequent reports; (iii) media articles and reports; (iv) regulatory filings and other information disseminated by Inventure; and (v) upon information and belief.  The allegations specifically pertaining to plaintiff are based on personal knowledge.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a stockholder derivative action brought on behalf of nominal defendant Inventure against certain of its officers and directors for breaches of fiduciary duties and violations of law.  These wrongs resulted in hundreds of millions of dollars in damages to Inventure's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed the Company to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.     Inventure is a leading marketer and manufacturer of healthy/natural and indulgent specialty snack food brands.  The Company operates in two segments: frozen products and snack products.

3.     As is the case for all food manufacturers, proper food safety is critically important to Inventure's business.   Indeed, for years the Company has explicitly highlighted the significant risks associated with food safety in its annual filings with the U.S. Securities and Exchange Commission ("SEC"), stating that "[c]oncerns with the safety and quality of certain food products or ingredients could cause customers to avoid [Inventure's] products," and the Company "could be adversely affected if customers in [Inventure's] principal markets lose confidence in the safety and quality of certain products or ingredients."  In light of these risks, Inventure's proxy statements regularly

- 1 -

assure investors that the Company's Board of Directors (the "Board"): (i) oversees "the process established to report and monitor systems for material risks applicable to the Company;" and (ii) "regularly reviews enterprise-wide risk management, including food safety [and] internal controls."

4.    In stark contrast to the above representations, documents produced to plaintiff by Inventure pursuant to 8 Delaware General Corporation Law Code section 220 ("Section 220") reveal that for years the Board failed to ensure the implementation of adequate internal controls to ensure critical food safety hazards were timely brought to the Board's attention, and also failed to timely and adequately address known and significant food safety hazards at the Company's facilities.  Due to these Board failures, at least one of Inventure's six manufacturing plants, the Company's sole frozen food packaging facility located in Jefferson, Georgia (the "Jefferson Facility"), has long been plagued with a plethora of unsanitary conditions.  As a result, on at least two separate occasions after Inventure acquired the plant in November 2013, including in April 2015 and again in June 2016, the FDA found significant amounts of Listeria Monocytogenes ("Listeria") at the Jefferson Facility, thus necessitating the recall and destruction of approximately 200,000 pounds of food that was processed there (the "Recall").[1]  Listeria, one of the worst foodborne pathogens, causes the infection listeriosis, which can lead to fever, muscle aches, nausea, headache, diarrhea, and/or death.

5.    The unsanitary conditions at the Jefferson Facility were no secret at Inventure prior to the Recall.  Indeed, the Company's document production confirmed that for several years before Inventure's November 2013 acquisition of the Jefferson Facility, the facility received multiple reports of violations *per year* from the FDA and/or GDA.  These reports (which the Company produced to plaintiff and which are reasonably

---

[1] The Recall occurred in connection with the April 2015 Listeria findings.  To date, the Company has not publicly disclosed that the Jefferson Facility again tested positive for Listeria in June 2016.  In that case, a second recall was apparently not necessary given that the affected product was purportedly destroyed after testing and prior to shipping.

believed to have been provided to the Company during due diligence as part of the acquisition) repeatedly identified reoccurring food safety violations at the run-down Jefferson Facility, including: (i) numerous discoveries of mold throughout the facility and on its rusty and worn-down equipment; (ii) poor drainage and puddled water in several rooms; and (iii) flaking paint on multiple walls and equipment.  Further, on October 22, 2014, approximately five months *before* the Recall and nearly a year *after* the Company took possession of the Jefferson Facility, the GDA inspected the facility (the "October 2014 Inspection") and found a laundry list of unsanitary conditions that were substantially similar to those previously and repeatedly identified by the FDA and GDA each of which could likely breed Listeria or other harmful contaminants, including, among other things: (i) failure to provide adequate screening or other protection against pests; (ii) failure to take effective measures to protect food transported by conveyor from contamination; (iii) standing water in various areas; (iv) pitted and worn floors; (v) buildup of food/dirt debris in several rooms; (vi) peeling paint on the walls and floors; (vii) walls with large holes; and (viii) tape peeling from the ceiling.

6.     Thereafter, approximately one month before the Recall, a complaint was filed with the FDA concerning continuing unsafe and unsanitary conditions at the Jefferson Facility (the "FDA Complaint").  A subsequent joint GDA and FDA inspection on April 17, 2015 (the "April 2015 Inspection"), found conditions substantially similar to those found by the October 2014 Inspection.  Shockingly, Board minutes produced by the Company reveal that the Board never even discussed *any* of these serious problems until April 22, 2015, one day before the Recall.

7.     The Recall and remediation efforts had a disastrous effect on the Company. As an initial matter, the Company was forced to stop production at the Jefferson Facility for months in order to purportedly remediate the problems.  Further, the gross profit of Inventure's frozen products segment fell $29.6 million, *over 90%*, in the 2015 fiscal year compared to the 2014 fiscal year results, and the Recall cost Inventure over $17 million in expenses as well as an asset impairment charge of $9.3 million.  More, the Company's

stock price predictably plummeted after the public learned of the Recall, tumbling nearly 25% in two days and wiping out over $56 million in market capitalization.  In addition, as a direct result of this unlawful course of conduct, the Company is now the subject of at least one securities class action lawsuit filed in the Superior Court of the State of Arizona, County of Maricopa (the "Securities Class Action"), on behalf of investors who purchased tens of millions of dollars of Inventure's stock in connection with a secondary offering held by the Company on or about September 17, 2014 (the "Offering").  The Securities Class Action alleges that documents filed by the Company with the SEC in connection with the Offering materially misled investors with respect to: (i) the Company's adherence to regulatory laws governing the safe processing of foods; (ii) the inadequacy of the Company's quality and safety controls over food manufacturing; and (iii) the quality of the Company's manufacturing facilities and capabilities, specifically its Jefferson Facility.

8.     Shockingly, in the aftermath of the Recall, the Board utterly failed to ensure that adequate remediation efforts were undertaken at the Jefferson Facility.  In fact, non-public documents produced by the Company in response to plaintiff's inspection demand reveal that the Jefferson Facility continues to be plagued with problems similar to those identified in the October 2014 Inspection and the April 2015 Inspection.  Specifically, between June 20 and 24, 2016, the FDA inspected the Jefferson Facility (the "June 2016 Inspection") and observed, among other unsanitary conditions: (i) holes in the floors, walls, and ceiling, including holes in ceiling tiles directly above the raw ingredient staging area; (ii) excess filth, dirt, debris, and food particles in various areas; (iii) opened food and seasoning containers with "apparent insects" in the seasoning; (iv) raw ingredients under a conveyor belt that "contained build-up of black residue;" (v) pitted surfaces that are "not easily cleanable;" and (vi) the use of gloves that were "not maintained in an intact, clean, and sanitary condition."

9.     Two weeks later, on July 8, 2016, the FDA informed Inventure that the FDA found Listeria on twelve of ninety-nine individual swabs taken from the Jefferson

Facility during the June 2016 Inspection.  Luckily for consumers and the Company, this time the FDA found the Listeria before the products were shipped, thus allowing Inventure to destroy the food without the likely devastating public fanfare of being forced to issue yet another Listeria related recall.

10.     To make matters worse, in 2015 and 2016, the Individual Defendants (as defined herein) negligently filed materially misleading proxy statements.  The proxy statements urged stockholders to vote to re-elect the directors.  The proxy statements, however, misleadingly assured investors that the Board adequately oversees food safety risks and also meaningfully implements relevant internal controls with respect thereto.

11.     Plaintiff brings this action against the Individual Defendants to repair the harm that they caused with their faithless actions.

### JURISDICTION AND VENUE

12.     Pursuant to 28 U.S.C. §1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

13.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

14.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) Inventure maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Inventure, occurred in

this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

15.     Plaintiff Robert Hutton was a stockholder of Inventure at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Inventure stockholder.

**Nominal Defendant**

16.     Nominal defendant Inventure is a Delaware corporation with principal executive offices located at 5415 East High Street, Suite 350, Phoenix, Arizona. Inventure is a marketer and manufacturer of healthy/natural snack food brands. Inventure operates in two segments: frozen products and snack products. The frozen products segment produces frozen fruits, vegetables, beverages, and frozen desserts for sale primarily to groceries, club stores, and mass merchandisers. The snack products segment produces potato chips, kettle chips, potato crisps, potato skins, pellet snacks, sheeted dough products, and extruded products for sale primarily to snack food distributors and retailers. Inventure has plants in Arizona, Florida, Georgia, Indiana, Oregon, and Washington. As of December 26, 2015, Inventure had 1,100 employees.

**Defendants**

17.     Defendant Terry McDaniel ("McDaniel") is Inventure's Chief Executive Officer and a director and has been since May 2008. Defendant McDaniel was also Inventure's Chief Operating Officer from April 2006 to April 2008. Defendant McDaniel is named as a defendant in the related Securities Class Action, which alleges he violated sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"). Defendant McDaniel knowingly, recklessly, or with gross negligence: (i) caused or allowed Inventure to operate with significant deficiencies in the Company's food safety controls and internal reporting controls; (ii) caused or allowed the Company to fail to

comply with U.S. Department of Agriculture ("USDA") and FDA rules and regulations concerning food safety; (iii) failed to ensure the Jefferson Facility was properly maintained and did not operate in unsanitary conditions that significantly jeopardized food safety; and (iv) caused or allowed the Individual Defendants to make improper public statements about Inventure's business, including with respect to the Offering. Defendant McDaniel also negligently violated section 14(a) of the Exchange Act by causing Inventure to make misleading statements in its 2015-2016 proxy statements. Inventure paid defendant McDaniel the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2015 | $511,135 | $558,820 | - | $47,514 | $1,117,469 |
| 2014 | $469,998 | $644,278 | $204,991 | $45,564 | $1,364,831 |
| 2013 | $458,205 | $360,500 | - | $39,443 | $858,148 |

18.     Defendant Steve Weinberger ("Weinberger") is Inventure's Chief Financial Officer and has been since August 2006.  Defendant Weinberger is named as a defendant in the related Securities Class Action, which alleges he violated sections 11, 12(a)(2) and 15 of the Securities Act.  Defendant Weinberger knowingly, recklessly, or with gross negligence: (i) caused or allowed Inventure to operate with significant deficiencies in the Company's food safety controls and internal reporting controls; (ii) caused or allowed the Company to fail to comply with USDA and FDA rules and regulations concerning food safety; (iii) failed to ensure the Jefferson Facility was properly maintained and did not operate in unsanitary conditions that significantly jeopardized food safety; and (iv) caused or allowed the Individual Defendants to make improper public statements about Inventure's business, including with respect to the Offering.  Inventure paid defendant Weinberger the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|--------------|----------------------------------------|------------------------|-------|
| 2015 | $325,474 | - | $201,158 | - | $52,608 | $579,240 |
| 2014 | $309,555 | - | $231,915 | $105,406 | $59,277 | $706,153 |
| 2013 | $301,428 | $10,000 | $155,015 | - | $51,866 | $518,309 |

1      19.      Defendant Timothy A. Cole ("Cole") is Inventure's Interim Chairman of the
2    Board and has been since January 2017 and a director and has been since May 2014.
3    Defendant Cole knowingly or recklessly: (i) caused or allowed Inventure to operate with
4    significant deficiencies in the Company's food safety controls and internal reporting
5    controls; (ii) caused or allowed the Company to fail to comply with USDA and FDA
6    rules and regulations concerning food safety; (iii) failed to ensure the Jefferson Facility
7    was properly maintained and did not operate in unsanitary conditions that significantly
8    jeopardized food safety; and (iv) caused or allowed the Individual Defendants to make
9    improper public statements about Inventure's business, including with respect to the
10    Offering.  Defendant Cole also negligently violated section 14(a) of the Exchange Act by
11    causing Inventure to make misleading statements in its 2015-2016 proxy statements.
12    Inventure paid defendant Cole the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2015 | $32,500 | $31,689 | - | $64,189 |
| 2014 | $16,251 | $20,423 | $16,115 | $52,789 |

16      20.      Defendant Ashton D. Asensio ("Asensio") is an Inventure director and has
17    been since February 2006.  Defendant Asensio was also Chairman of Inventure's Audit
18    Committee from July 2006 to at least April 2016.  Defendant Asensio knowingly or
19    recklessly: (i) caused or allowed Inventure to operate with significant deficiencies in the
20    Company's food safety controls and internal reporting controls; (ii) caused or allowed the
21    Company to fail to comply with USDA and FDA rules and regulations concerning food
22    safety; (iii) failed to ensure the Jefferson Facility was properly maintained and did not
23    operate in unsanitary conditions that significantly jeopardized food safety; and (iv)
24    caused or allowed the Individual Defendants to make improper public statements about
25    Inventure's business, including with respect to the Offering.  Defendant Asensio also
26    negligently violated section 14(a) of the Exchange Act by causing Inventure to make
27    misleading statements in its 2015-2016 proxy statements.   Inventure paid defendant
28    Asensio the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2015 | $40,000 | $31,689 | - | $71,689 |
| 2014 | $40,000 | $20,423 | $16,115 | $76,538 |
| 2013 | $40,000 | $18,025 | $18,150 | $76,175 |

21.     Defendant Macon Bryce Edmonson ("Edmonson") is an Inventure director and has been since July 2006.  Defendant Edmonson was also a member of Inventure's Audit Committee from at least April 2012 to May 2014.   Defendant Edmonson knowingly or recklessly: (i) caused or allowed Inventure to operate with significant deficiencies in the Company's food safety controls and internal reporting controls; (ii) caused or allowed the Company to fail to comply with USDA and FDA rules and regulations concerning food safety; (iii) failed to ensure the Jefferson Facility was properly maintained and did not operate in unsanitary conditions that significantly jeopardized food safety; and (iv) caused or allowed the Individual Defendants to make improper public statements about Inventure's business, including with respect to the Offering.  Defendant Edmonson also negligently violated section 14(a) of the Exchange Act by causing Inventure to make misleading statements in its 2015-2016 proxy statements.   Inventure paid defendant Edmonson the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2015 | $25,000 | $31,689 | - | $56,689 |
| 2014 | $35,938 | $20,423 | $16,115 | $72,476 |
| 2013 | $46,250 | $18,025 | $18,150 | $82,425 |

22.     Defendant Paul J. Lapadat ("Lapadat") is an Inventure director and has been since May 2013.  Defendant Lapadat was also a member of Inventure's Audit Committee from May 2013 to at least April 2016.  Defendant Lapadat knowingly or recklessly: (i) caused or allowed Inventure to operate with significant deficiencies in the Company's food safety controls and internal reporting controls; (ii) caused or allowed the Company to fail to comply with USDA and FDA rules and regulations concerning food safety; (iii) failed to ensure the Jefferson Facility was properly maintained and did not

- 9 -

operate in unsanitary conditions that significantly jeopardized food safety; and (iv) caused or allowed the Individual Defendants to make improper public statements about Inventure's business, including with respect to the Offering.   Defendant Lapadat also negligently violated section 14(a) of the Exchange Act by causing Inventure to make misleading statements in its 2015-2016 proxy statements.   Inventure paid defendant Lapadat the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2015 | $47,500 | $31,689 | - | $79,189 |
| 2014 | $47,500 | $20,423 | $16,115 | $84,038 |
| 2013 | $24,063 | $18,025 | $18,150 | $60,238 |

23.   Defendant Harold S. Edwards ("Edwards") is an Inventure director and has been since May 2014.  Defendant Edwards was also a member of Inventure's Audit Committee from May 2014 to at least April 2016.  Defendant Edwards knowingly or recklessly: (i) caused or allowed Inventure to operate with significant deficiencies in the Company's food safety controls and internal reporting controls; (ii) caused or allowed the Company to fail to comply with USDA and FDA rules and regulations concerning food safety; (iii) failed to ensure the Jefferson Facility was properly maintained and did not operate in unsanitary conditions that significantly jeopardized food safety; and (iv) caused or allowed the Individual Defendants to make improper public statements about Inventure's business, including with respect to the Offering.  Defendant Edwards also negligently violated section 14(a) of the Exchange Act by causing Inventure to make misleading statements in its 2015-2016 proxy statements.   Inventure paid defendant Edwards the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2015 | $35,000 | $31,689 | - | $66,689 |
| 2014 | $17,500 | $20,423 | $16,115 | $54,038 |

24.   Defendant David L. Meyers ("Meyers") was Inventure's Chairman of the Board from September 2013 to January 2017 and a director from May 2013 to January

2017.  Defendant Meyers was also a member of Inventure's Audit Committee from May 2013 to September 2013.  Defendant Meyers knowingly or recklessly: (i) caused or allowed Inventure to operate with significant deficiencies in the Company's food safety controls and internal reporting controls; (ii) caused or allowed the Company to fail to comply with USDA and FDA rules and regulations concerning food safety; (iii) failed to ensure the Jefferson Facility was properly maintained and did not operate in unsanitary conditions that significantly jeopardized food safety; and (iv) caused or allowed the Individual Defendants to make improper public statements about Inventure's business, including with respect to the Offering.  Defendant Meyers also negligently violated section 14(a) of the Exchange Act by causing Inventure to make misleading statements in its 2015-2016 proxy statements.  Inventure paid defendant Meyers the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2015 | $62,500 | $63,369 | - | $125,869 |
| 2014 | $62,500 | $40,845 | $32,234 | $135,579 |
| 2013 | $28,750 | $30,125 | $30,400 | $89,275 |

25.    Defendant Itzhak Reichman ("Reichman") was Inventure's Chairman of the Board from May 2010 to May 2013 and a director from October 2007 to May 2014. Defendant Reichman knowingly or recklessly : (i) caused or allowed Inventure to operate with significant deficiencies in the Company's food safety controls and internal reporting controls; (ii) caused or allowed the Company to fail to comply with USDA and FDA rules and regulations concerning food safety; (iii) failed to ensure the Jefferson Facility was properly maintained and did not operate in unsanitary conditions that significantly jeopardized food safety; and (iv) caused or allowed the Individual Defendants to make improper public statements about Inventure's business, including with respect to the Offering.  Inventure paid defendant Reichman the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2014 | $13,250 | - | - | $13,250 |

| 2013 | $39,900 | $18,025 | $18,150 | $76,075 |

26. The defendants identified in ¶¶17-18 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶17, 19-25 are referred to herein as the "Director Defendants." Collectively, the defendants identified in ¶¶17-25 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

27. By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Inventure and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Inventure in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Inventure and not in furtherance of their personal interest or benefit.

28. To discharge their duties, the officers and directors of Inventure were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Inventure were required to, among other things:

(a) ensure the Company's facilities were safe and sanitary;

(b) timely address and remedy known food safety concerns;

(c) conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(d) remain informed as to how Inventure conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

- 12 -

**Breaches of Duties**

29.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Inventure, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

30.    The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to operate unsafe and unsanitary facilities and mislead the public concerning the Company's substandard operations and improper practices that wasted the Company's assets, and thereby caused Inventure to incur substantial damage.

31.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of Inventure, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Inventure has expended, and will continue to expend, significant sums of money.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

32.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

33.    During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Inventure, regarding the Individual Defendants' management of Inventure's operations; and (ii) enhance the Individual

Defendants' executive and directorial positions at Inventure and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

34.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

35.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violation of securities laws, breach of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

36.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

37.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

**BACKGROUND OF INVENTURE AND THE JEFFERSON FACILITY**

38.    Inventure is a leading marketer and manufacturer of healthy/natural and indulgent specialty snack food brands.  The Company operates in two segments: frozen products and snack products.

39.     As of the first half of 2013, the Company owned four facilities identified as "Manufacturing" facilities in its annual reports.  In November 2013, Inventure acquired its fifth and sixth Manufacturing facilities, including the Jefferson Facility, when the Company acquired Fresh Frozen Foods.  The Jefferson Facility operates as a packaging facility capable of packaging approximately eighty-three million pounds of product annually.

**THE BOARD'S PURPORTED OVERSIGHT OF FOOD SAFETY AT INVENTURE**

40.     Food safety is critically important to all food manufacturers, including Inventure.   Indeed, for years the Company's annual reports have specifically highlighted critical need for proper food safety, the significant business risks associated with food safety, and the material adverse effects that would likely result from food safety failures and/or any recalls due to product contamination, stating:

**Risks Related to Our Business**

* * *

***We may incur losses and costs as a result of product liability claims that may be brought against us or any product recalls we have to make*.**

The sale of food products for human consumption involves the risk of injury to consumers. Such hazards could result from: tampering by unauthorized third parties; ***product contamination*** (such as ***listeria***, e-coli, and salmonella) or spoilage; the presence of foreign objects, substances, chemicals, and other agents; residues ***introduced during the growing, storage, handling or transportation phases***; or improperly formulated products. As a manufacturer and marketer of food products, we may be subjected to various product liability claims. The product liability and product recall insurance maintained by us may not be adequate to cover any loss or exposure for product liability, and such insurance may not continue to be available on terms acceptable to us. Any product liability claim not fully covered by insurance, as well as ***any adverse publicity from a product liability claim or product recall, could have a material adverse effect on our operating results, and we may also lose customer confidence in our brands***.

* * *

- 15 -

*Concerns with the safety and quality of certain food products or ingredients could cause customers to avoid our products.*

*We could be adversely affected if customers in our principal markets lose confidence in the safety and quality of certain products or ingredients.* Negative publicity about these concerns, whether or not valid, may discourage customers from buying our products or cause disruptions in production or distribution of our products.

41.     Given the above, the Board was and is required to pay particularly close attention to significant food safety risks at Inventure.  In fact, for years the Board has assured investors that Board members are directly involved in food safety oversight and regularly review food safety related matters.  In particular, each year the Company's annual proxy statements, filed with the SEC and signed by all Board members, state that "the Board of Directors has *oversight responsibility of the processes established to report and monitor systems for material risks* applicable to the Company" and "*[t]he full Board of Directors* considers strategic risks and opportunities and *regularly reviews enterprise-wide risk management, including food safety [and] internal controls.*"

42.     Given the Board's purported regular review of food safety concerns, it is reasonable to presume that the Board also reviews critical FDA guidance on the matter. Of particular relevance here, for years, the FDA has specifically warned food manufacturers that the exact same types of unsanitary conditions existing at the Jefferson Facility are known to create ideal breeding grounds for Listeria and other harmful microorganisms.  For example, the FDA manual, "Guidance for Industry: Control of Listeria monocytogenes in Refrigerated or Frozen Ready-To-Eat Foods," notes that standing water or improper drainage in a plant can lead to the growth of microorganisms such as Listeria.  The manual also notes that walls, ceilings and floors that are cracked, peeling, or damaged can harbor microorganisms, and that the accumulation of heavy soil or debris on floors provides breeding grounds for harmful microorganisms.  As a result, 2013 FDA Food Code (6-101.11(A)(1)) provides that proper industry standards require these surfaces to be smooth, durable, in good repair, and accessible for cleaning, and also adequately maintained in order to resist deterioration caused by product or cleaning

chemicals.  The Board either knew or should have known of these critical food safety guidelines.

**THE BOARD FAILED TO ENSURE ADEQUATE REMEDIATION OF NUMEROUS UNSAFE AND UNSANITARY CONDITIONS AT THE JEFFERSON FACILITY**

43.    At the time the Company purchased the Jefferson Facility in November 2013, and continuing to the present, the facility was in dire need of capital improvements and corrective actions to rectify numerous unsanitary conditions.  As detailed below, however, prior to the Recall the Board utterly failed to implement an adequate reporting system to ensure this vital information was timely discussed and adequately addressed. Worse, following the Recall the Board utterly failed to ensure adequate remediation at the Jefferson Facility to properly address the unsanitary conditions that led to Listeria contamination.

44.    The documents produced to plaintiff by Inventure included numerous FDA and GDA inspection reports concerning the Jefferson Facility.  As detailed in these reports, for several years prior to Inventure's acquisition of Fresh Frozen Foods, the Jefferson Facility was notified by the FDA and/or GDA of ***multiple food safety violations per year***.  These violations repeatedly identified unsanitary conditions at the rundown Jefferson Facility that were substantially similar to those that led to the 2015 and 2016 Listeria contaminations.  For example, between March 2009 and September 2012, the FDA and/or GDA repeatedly identified violations for, among other things: (i) poor or inadequate plumbing and drainage; (ii) leaking roofing; (iii) flaking paint on the walls and equipment; (iv) rusty, worn-out, and unsafe equipment; and (v) numerous findings of widespread mold.  On reason and belief to be later proved at trial, these reports were all provided to the Company during due diligence when Inventure acquired Fresh Frozen Foods.  Unfortunately, documents produced by the Company confirm that the Board failed to implement adequate internal controls to ensure this information was even brought to the Board's attention commensurate with the acquisition, and the Board never discussed these serious issues before the acquisition or long after the Company

1    took possession of the facility.

2          45.    On October 22, 2014, nearly a year *after* the Company took possession of

3    the Jefferson Facility, the GDA inspected it and found a wide variety of obvious

4    unsanitary conditions that are known to breed dangerous bacteria and foodborne

5    contaminants.    According to the GDA, the Jefferson Facility: (i) lacked "adequate

6    screening or other protection against pests;" (ii) lacked "effective measures to protect

7    food transported by conveyor from contamination," and (iii) Inventure "[f]ail[ed] to

8    maintain buildings, fixtures, or other physical facilities in a sanitary condition."  Among

9    other things, the GDA discovered a buildup of food and dirt debris in the food mixing

10   room and bagging room, peeling paint on the walls and floors, pitted and worn floors,

11   improper drainage, and standing water.  The GDA's findings, however, were not publicly

12   disclosed at the time, and the Jefferson Facility continued to operate with unsanitary

13   conditions thereafter.  To make matters worse, documents produced by the Company

14   confirm again that the Board failed to implement adequate internal controls to ensure this

15   vital information reached the Board at the time.  Indeed, of the thirty-eight Board minutes

16   produced by the Company dated between 2013 and 2016, not one of them referenced the

17   numerous violations at the Jefferson Facility prior to the acquisition or the October 2014

18   Inspection, including minutes for a Board meeting that occurred on October 28, 2014, the

19   week after the October 2014 Inspection.

20         46.    On March 2, 2015, the FDA Complaint was filed concerning the continuing

21   unsafe and unsanitary conditions at the Jefferson Facility.  Among other problems, the

22   FDA Complaint reported "vegetables going thru mold contaminated machinery … during

23   processing and standing water on [the] floor due to no drainage, resulting in bacterial

24   growth."  More, the FDA officer receiving the complaint noted that these conditions

25   indicated "Improper CGMPs," the acronym for Current Good Manufacturing Practices,

26   which ensure the quality of processed foods.  Again, the Board apparently was never

27   apprised of this critical revelation, which is never referenced in any of the Board minutes.

28

47.     On April 17, 2015, the GDA and the FDA conducted a joint inspection of the Jefferson Facility (the April 2015 Inspection).  The April 2015 Inspection, which lasted eight hours, again found unsanitary and unsafe conditions substantially similar to the October 2014 Inspection, including conditions that "may cause contamination of food being processed" due to poor drainage, condensation, flaking walls and ceilings, damaged floors, and accumulation of filth and debris.

48.     On April 22, 2015, nearly **a year and a half after the Company first took possession of the Jefferson Facility**, the Board finally met to, among other things, discuss the unsanitary conditions at the Jefferson Facility.  This was the first time any food safety concerns were mentioned in any of the Board minutes produced by the Company.  According to the minutes for this meeting, the Board was finally provided with "an overview of the events leading up to and arising since the date of the initial visit by regulatory authorities to the Jefferson [Facility]."  Following the discussion, the Board approved a relevant press release to be issued the following day.

49.     On April 23, 2015, five days after the April 2015 Inspection, the Company issued a press release announcing that it initiated a **recall of nearly 200,000 pounds of food** manufactured in the Jefferson Facility (the Recall) due to the Jefferson Facility testing positive for Listeria, a highly virulent foodborne pathogen that can cause fever, muscle aches, nausea, headache, diarrhea, and/or death.

50.     Following the massive April 2015 Recall, the Board occasionally met to discuss "food safety" issues in general and the problems at the Jefferson Facility, but ultimately utterly failed to ensure adequate remediation efforts at the Jefferson Facility to prevent further Listeria contamination.  On June 23, 2015, the GDA inspected the Jefferson Facility and reported that all violations had been corrected as of that date.  Such corrections, however, were short lived.

51.     On July 1, 2015, the GDA hand-delivered a letter to Inventure to inform the Company that water samples at the dilapidated Jefferson Facility "tested positive for coliform bacteria … the standard indicator of insanitary conditions in drinking water."

Over the span of the following year, the Jefferson Facility deteriorated to unsanitary business as usual.  In fact, documents produced by the Company in response to plaintiff's inspection demand revealed that as of June 2016, the Jefferson Facility continues to be plagued with substantially similar problems to those identified in the October 2014 Inspection and the April 2015 Inspection.  Between June 20 and 24, 2016, the FDA inspected the Jefferson Facility (the June 2016 Inspection) and observed, among other unsanitary conditions: (i) holes in the floors, walls, and ceiling, including holes in ceiling tiles directly above the raw ingredient staging area; (ii) excess filth, dirt, debris, and food particles in various areas; (iii) opened food and seasoning containers with "apparent insects" in the seasoning; (iv) raw ingredients under a conveyor belt that "contained build-up of black residue"; (v) pitted surfaces that are "not easily cleanable"; and (vi) the use of gloves that were "not maintained in an intact, clean, and sanitary condition."  Two weeks later, on July 8, 2016, the FDA informed Inventure that the FDA found Listeria on twelve of ninety-nine individual swabs taken from the Jefferson Facility during the June 2016 Inspection.  Fortunately, the FDA discovered the Listeria before the products were shipped, thus allowing Inventure to destroy them without issuing yet another devastating recall.

**THE INDIVIDUAL DEFENDANTS ISSUE MATERIALLY MISLEADING STATEMENTS CONCERNING THE COMPANY'S PURPORTED "STATE-OF-THE-ART" MANUFACTURING FACILITIES**

52.     On March 13, 2014, the Individual Defendants caused or allowed Inventure to file with the SEC its Annual Report on Form 10-K for the fiscal year ended December 28, 2013 (the "2013 Form 10-K").  The 2013 Form 10-K, which was signed by all Board members, correctly stated that the Company was subject to special rules and regulations as a food manufacturer, but misrepresented that Inventure actually complied with such rules and regulations.  The 2013 Form 10-K further wrongfully touted that all of Inventure's properties were in "good operating condition and are suitable for [the Company's] current purposes."  The 2013 Form 10-K stated:

**Government Regulation**

*The manufacture, labeling and distribution of our products are subject to the rules and regulations of a variety of federal, state, and other governmental agencies*. There can be no assurance that new laws or regulations will not be passed that could require us to alter the taste or composition of our products or impose other obligations on us. New or increased government regulation of the food industry, including, but not limited to, laws or regulations related to food safety, chemical composition, production processes, traceability, product quality, packaging, labeling, and product recalls, could adversely impact our results or operations by increasing production costs, or restricting our methods of operation and distribution. Such changes could also affect sales of our products and have a material adverse effect on us. These regulations may address food industry or society factors, such as obesity, nutritional and environmental concerns and diet trends. In addition to laws relating to food products, our operations are governed by laws relating to environmental matters, workplace safety and worker health. *We believe that we presently comply in all material respects with such laws and regulations*.

\* \* \*

We also believe that *our properties generally are in good operating condition and are suitable for our current purposes*.

53.     In each subsequent year, the Individual Defendants caused or allowed the Company to file additional Annual Reports using substantially similar language to the 2013 Form 10-K, including on March 10, 2015, and March 10, 2016.  These Annual Reports, which were each signed by all members of the Board, failed to disclose that at least one of the Company's six facilities, the Jefferson Facility, failed to comply with the USDA and the FDA's respective standards for manufacturing food and preventing contamination, including preventing the growth of Listeria and other microorganisms.

54.     On or about September 17, 2014, a full ten months after Inventure took possession of the Jefferson Facility, the Company held a secondary offering to sell over $53 million worth of Inventure stock at an average price of over $12 per share (the Offering).   In connection with the Offering, Inventure filed with the SEC a shelf registration statement effective as of August 28, 2014 (the "Registration Statement") and prospectus supplement dated September 12, 2014 (the "Prospectus Supplement")

(collectively, the "Offering Documents").  The Offering Documents, which were signed by defendants McDaniel and Weinberger, incorporated the materially misleading 2013 Form 10-K by reference, which was signed by all Board members and "considered to be a part of [the Prospectus Supplement]."

55.    The Offering Documents misleadingly boasted that Inventure's six purported "state-of-the-art" facilities utilized "advanced manufacturing capabilities" which provided the Company with "competitive strengths [that] differentiate [Inventure] from [its] competitors and contribute to [the Company's] continued success."  These statements omitted material information concerning the dilapidated Jefferson Facility and its numerous unsanitary conditions that failed to comply with the USDA's and FDA's standards for manufacturing food and preventing contamination from the growth of Listeria and other microorganisms.

56.    Following the Recall, Inventure's stock price has never once traded above the $12 Offering price.

### THE INDIVIDUAL DEFENDANTS CAUSE INVENTURE TO FILE MATERIALLY MISLEADING PROXY STATEMENTS

**The Materially Misleading 2015 Proxy**

57.    On April 21, 2015, defendants McDaniel, Cole, Asensio, Edmonson, Lapadat, Edwards, and Meyers caused Inventure to file with the SEC a Proxy Statement in connection with the 2015 Annual Meeting of Stockholders, held on May 20, 2015 (the "2015 Proxy").  In the 2015 Proxy, defendants solicited stockholder votes to, among other things, re-elect themselves to the Board.  Defendants issued materially misleading statements with respect to these solicited votes.

58.    The 2015 Proxy stated the following in support of re-electing the current directors:

**Board of Directors Role in Risk Oversight**

Mr. David L. Meyers has served as Chairman of our Board of Directors since September 18, 2013, Mr. Ashton D. Asensio has served as Chairman

of our Audit Committee since 2006, and Mr. Paul J. Lapadat has served as Chairman of our Compensation Committee since September 18, 2013. Messrs. Meyers, Asensio and Lapadat provide strong independent leadership in their respective functions. It is management's responsibility to manage risk and bring to the Board of Directors' attention the most material risks to the Company, but ***the Board of Directors has oversight responsibility of the processes established to report and monitor systems for material risks applicable to the Company***. Our Chairman of the Board of Directors and our Audit Committee and Compensation Committee help facilitate this oversight function. ***The full Board of Directors considers strategic risks and opportunities and regularly reviews enterprise-wide risk management, including food safety, internal controls, compliance and ethics***, insurance, and ***operations***.

59.     Defendants' statements misleadingly suggested that the Board: (i) maintained adequate oversight of "the processes established to report and monitor systems for material risks applicable to the Company"; and (ii) "regularly reviews enterprise-wide risk management, including food safety, internal controls, compliance and ethics."   The 2015 Proxy omitted any disclosures regarding: (i) significant deficiencies in Inventure's food safety controls; (ii) the Company's non-compliance with USDA and FDA rules and regulations concerning food safety; and (iii) the significant reporting failures that failed to timely apprise the Board of serious food safety concerns at the Jefferson Facility.   Indeed, as detailed above, meeting minutes of the Board confirm that the Board did not even learn about the dilapidated, unsanitary, and unsafe conditions at the Jefferson Facility until the day before the Recall, almost a year and a half after Inventure took possession of the facility, and a full six months after the GDA specifically informed Inventure of such dangerous conditions.

60.     The 2015 Proxy harmed Inventure by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors.   As a result of the Individual Defendants' misleading statements in the 2015 Proxy, Inventure's stockholders voted to re-elect defendants McDaniel, Asensio, Cole, Edmonson, Edwards, Lapadat, and Meyers to Inventure's Board.

**The Materially Misleading 2016 Proxy**

61.     On April 11, 2016, defendants McDaniel, Cole, Asensio, Edmonson, Lapadat, Edwards, and Meyers caused Inventure to file with the SEC a Proxy Statement in connection with the 2016 Annual Meeting of Stockholders, held on May 11, 2016 (the "2016 Proxy").   In the 2016 Proxy, defendants solicited stockholder votes to, among other things, re-elect themselves to the Board.  Defendants issued materially misleading statements with respect to these solicited votes.

62.     The 2016 Proxy stated the following in support of re-electing the current directors:

> **Board of Directors Role in Risk Oversight**
>
> Mr. David L. Meyers has served as Chairman of our Board of Directors since September 18, 2013, Mr. Ashton D. Asensio has served as Chairman of our Audit Committee since 2006, and Mr. Paul J. Lapadat has served as Chairman of our Compensation Committee since September 18, 2013. Messrs. Meyers, Asensio and Lapadat provide strong independent leadership in their respective functions. It is management's responsibility to manage risk and bring to the Board of Directors' attention the most material risks to the Company, but the Board of Directors has oversight responsibility of the processes established to report and monitor systems for material risks applicable to the Company. Our Chairman of the Board of Directors and our Audit Committee and Compensation Committee help facilitate this oversight function. ***The full Board of Directors considers strategic risks and opportunities and regularly reviews enterprise-wide risk management, including food safety, internal controls, compliance and ethics, insurance, and operations***.

63.     Defendants' statements misleadingly suggested that the Board: (i) maintained adequate oversight of "the processes established to report and monitor systems for material risks applicable to the Company"; and (ii) "regularly reviews enterprise-wide risk management, including food safety, internal controls, compliance and ethics."   The 2016 Proxy omitted any disclosures regarding: (i) significant deficiencies in Inventure's food safety controls; (ii) the Company's past and continuing non-compliance with USDA and FDA rules and regulations concerning food safety; (iii) the significant reporting failures that failed to timely apprise the Board of serious food

safety concerns at the Jefferson Facility; and (iv) the Board's continuing failure to ensure that the Company timely and adequately addressed and repaired the Jefferson Facility. As detailed above, just two months after the 2016 Proxy was filed, the FDA inspected the Jefferson Facility and found Listeria as well as unsanitary conditions that were substantially similar to those previously identified by the GDA and FDA in 2014 and 2015.

64.     The 2016 Proxy harmed Inventure by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors.   As a result of the Individual Defendants' misleading statements in the 2016 Proxy, Inventure's stockholders voted to re-elect defendants McDaniel, Asensio, Cole, Edmonson, Edwards, Lapadat, and Meyers to Inventure's Board.

## THE TRUTH PARTIALLY EMERGES

65.     The truth behind the Company's business prospects and Individual Defendants' wrongdoing began to emerge on April 23, 2015, when the Company issued the Recall.  On that date, Inventure issued a press release stating:

**Inventure Foods, Inc. Issues Voluntary Recall of Its Fresh Frozen™ Vegetables and Select Jamba® "At Home" Smoothie Kits Because of Possible Health Risk**

PHOENIX, April 23, 2015 /PRNewswire/ Inventure Foods, Inc. has issued a voluntary recall of certain varieties of its *Fresh Frozen™* line of frozen vegetables, as well as select varieties of its *Jamba "At Home"* line of smoothie kits, due to the finding of *Listeria monocytogenes,* in its Jefferson, GA facility. Listeria is an organism that can cause infections in young children, frail or elderly people, and others with weakened immune systems. Although healthy individuals may suffer only short-term symptoms such as high fever, severe headache, stiffness, nausea, abdominal pain and diarrhea, listeria infection can cause miscarriages and stillbirths among pregnant women.

To date, there are no known illnesses linked to consumption of *Fresh Frozen IQF* frozen vegetables or *Jamba "At Home"* smoothies. However, Inventure Foods has decided to err on the side of utmost caution and issue a

voluntary recall because *Listeria monocytogenes* was identified within the facility.

The Company urges anyone who has purchased a product listed below to not consume it and to instead return the package to the store where it was purchased for a full refund. If consumers have additional questions, representatives will be available 24/7 at 866-890-1004; via email at info@inventurefoods.com or visit InventureFoods.com/Information/Frozen Recall for the latest updates.

The Company said, "Please be assured that we are committed to producing the highest quality products and our top priority is the health and safety of consumers. It is with this commitment that we have initiated this voluntary recall as a precautionary measure and are working closely with the FDA to proactively remedy the situation."

The *Fresh Frozen* products being recalled are distributed to retail outlets, including food service accounts, mass merchandise stores and supermarkets in Alabama, Arizona, Arkansas, Florida, Georgia, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Nebraska, North Carolina, Ohio, Oklahoma, South Carolina, Tennessee, Texas, Virginia, West Virginia and Wisconsin.

The *Jamba "At Home"* smoothies' products being recalled are distributed to retail outlets, including mass merchandise stores and supermarkets east of the Mississippi River. Only specific *Jamba "At Home"* branded products are involved in this recall. No other *Jamba®* branded products are affected.

The products being recalled are identified below:

| Fresh Frozen Vegetable Products | | | |
|---|---|---|---|
| UPC | FF ITEM | PACK | |
| CODE | NUMBER | SIZE | DESCRIPTION |
| | | | |
| 0-86069-20000-1 | 102 | 6/2# | SPEC. BUTTER BEANS |
| 0-86069-50000-2 | 105 | 4/5# | SPEC. BUTTER BEANS |
| 0-86069-20010-0 | 112 | 6/2# | BABY LIMA BEANS |
| 0-86069-50010-1 | 115 | 4/5# | BABY LIMA BEANS |
| 0-86069-20020-9 | 124 | 6/2# | CUT GREEN BEANS |
| 0-86069-50020-0 | 125 | 4/5# | CUT GREEN BEANS |
| 0-86069-20340-8 | 132 | 6/2# | ITALIAN GREEN BEANS |
| 0-86069-50340-9 | 135 | 4/5# | ITALIAN GREEN BEANS |
| 0-86069-20030-8 | 203 | 6/2# | CROWDER PEAS |
| 0-86069-50030-9 | 205 | 4/5# | CROWDER PEAS |
| 0-86069-20040-7 | 212 | 6/2# | BLACKEYE PEAS |
| 0-86069-50040-8 | 215 | 4/5# | BLACKEYE PEAS |
| 0-86069-20041-4 | 222 | 6/2# | PURPLE HULL PEAS |
| 0-86069-50041-5 | 225 | 4/5# | PURPLE HULL PEAS |
| 0-86069-20050-6 | 242 | 6/2# | FIELD PEAS W/SNPS |
| 0-86069-50050-7 | 245 | 4/5# | FIELD PEAS W/SNPS |
| 0-86069-20060-5 | 252 | 6/2# | BUTTER PEAS |
| 0-86069-20005-6 | 256 | 6/2# | BUTTER BEANS |
| 0-86069-20016-2 | 144 | 12/24 oz | FORDHOOK LIMA BEANS |
| 0-86069-20061-2 | 262 | 6/2# | GREEN PEAS |
| 0-86069-50060-6 | 265 | 4/5# | GREEN PEAS |
| 0-86069-20290-6 | 272 | 6/2# | GREEN PEAS W/CARROTS |
| 0-86069-50290-7 | 275 | 4/5# | GREEN PEAS W/CARROTS |
| 0-86069-20042-1 | 283 | 6/2# | ZIPPER PEAS |
| 0-86069-20032-2 | 295 | 6/2# | WHITE ACRE PEAS |
| 0-86069-20070-4 | 303 | 6/2# | CUT OKRA |
| 0-86069-50240-2 | 305 | 4/5# | CUT OKRA |
| 0-86069-20350-7 | 312 | 6/2# | BABY WHOLE OKRA |
| **** NO UPC | 315 | 4/5# | BABY WHOLE OKRA |
| 0-86069-20075-9 | 323 | 6/2# | BREADED OKRA |
| 0-86069-50075-0 | 325 | 4/5# | BREADED OKRA |
| 0-86069-20100-8 | 402 | 6/2# | CUT YELLOW CORN |
| 0-86069-50100-9 | 405 | 4/5# | CUT YELLOW CORN |
| **** NO UPC | 421 | 96 CT | 3" CORN ON COB |

| | | | |
|---|---|---|---|
| 0-86069-20200-5 | 422 | 6/2# | 3" CORN ON COB |
| 0-86069-50250-1 | 425 | 4/5# | 3" CORN ON COB |
| 0-86069-20102-2 | 432 | 6/2# | SHOEPEG CORN |
| 0-86069-50102-3 | 435 | 4/5# | SHOEPEG CORN |
| 0-86069-20300-2 | 502 | 6/2# | SLICED YELLOW SQUASH |
| 0-86069-50300-3 | 505 | 4/5# | SLICED SQUASH |
| 0-86069-20270-8 | 510 | 6/2# | BREADED SQUASH |
| 0-86069-20310-3 | 522 | 6/2# | SLICED ZUCCHINI |
| 0-86069-20510-5 | 531 | 6/2# | CHOPPED VIDALIA ONIONS & SQUASH |
| 0-86069-20500-6 | 542 | 6/2# | CHOPPED VIDALIA ONIONS |
| 0-86069-20295-1 | 603 | 6/2# | SLICED CARROTS |
| **** NO UPC | 604 | 20# | SLICED CARROTS |
| 0-86069-20355-2 | 659 | 6/2# | BRUSSEL SPROUTS |
| 0-86069-20140-4 | 703 | 6/2# | CUT BROCCOLI |
| 0-86069-50140-5 | 705 | 4/5# | CUT BROCCOLI |
| 0-86069-20141-1 | 708 | 6/2# | BROCCOLI FLORETS |
| **** NO UPC | 762 | 12/2# | DICED CELERY |
| 0-86069-25071-6 | 774 | 6/2# | MUSTARD GREENS |
| 0-86069-25040-2 | 776 | 6/2# | IQF COLLARDS |
| 0-86069-25050-1 | 777 | 6/2# | IQF TURNIP GREENS |
| 0-86069-25060-0 | 778 | 6/2# | IQF TURNIP GREENS W/R |
| 0-86069-25090-7 | 779 | 6/2# | IQF CHOPPED SPINACH |
| **** NO UPC | 792 | 12/2# | DICED ONIONS |
| **** NO UPC | 795 | 12/2# | DICED RED PEPPER |
| **** NO UPC | 798 | 12/2# | DICED GREEN PEPPER |
| 0-86069-50080-4 | 805 | 4/5# | MIXED VEGETABLES |
| 0-86069-20080-3 | 806 | 6/2# | MIXED VEGETABLES |
| 0-86069-20014-8 | 813 | 6/2# | PREMIUM CALIFORNIA BLEND |
| 0-86069-20011-7 | 814 | 6/2# | CALIFORNIA BLEND |
| 0-86069-50011-8 | 815 | 4/5# | CALIFORNIA BLEND |
| 0-86069-20330-9 | 826 | 6/2# | SUMMER BLEND |
| 0-86069-20150-3 | 833 | 6/2# | VEGETABLE GUMBO |
| 0-86069-20160-2 | 836 | 6/2# | VEGETABLE SOUP MIX W/TOMATOES |
| 0-86069-21270-7 | 842 | 6/2# | STEW MIX |
| 0-86069-20280-7 | 852 | 6/2# | STIR FRY BLEND |
| 0-86069-20285-2 | 862 | 6/2# | ITALIAN BLEND |
| 0-86069-20425-2 | 866 | 6/2# | FAJITA BLEND |
| 0-86069-20400-9 | 877 | 6/2# | TEJANO BLEND |
| 0-86069-20405-4 | 882 | 6/2# | JALISCO BLEND |
| 0-86069-20432-0 | 897 | 4/5# | SEASONING BLEND |
| 0-86069-20430-6 | 898 | 6/2# | SEASONING BLEND |
| 0-86069-20170-1 | 856 | 6/2# | COUNTRY BLEND |
| 0-86069-10180-3 | 90199 | 12/1# | WHOLE STRAWBERRIES |
| 0-86069-10260-2 | 91199 | 12/1# | WHOLE BLACKBERRIES |
| 0-86069-10190-2 | 92199 | 12/1# | SLICED PEACHES |
| 0-86069-10500-9 | 952 | 24/12 oz | BLUEBERRIES |
| 0-86069-10230-5 | 971 | 18/12 oz | TRIPLE BERRY BLEND |
| 0-86069-20120-6 | 1002 | 6/2# | YAM PATTIES |
| 0-86069-20112-1 | 1570 | 8/28 oz | SWEET POTATO CUTS |

| 0-86069-50265-5 | 1582 | 4/5# | BOIL BLEND |
| 0-86069-95015-9 | 4022 | 12/12 CT | SOUTHERN STYLE BISCUITS |
| 0-86069-95020-3 | 4031 | 12/12 CT | CHEESE BISCUITS |
| 0-86069-95040-1 | 4061 | 12/12 CT | BUTTER BISCUITS |
| 0-86069-11200-7 | S124 | 12/12oz | CUT GREEN BEANS |
| 0-86069-11210-6 | S262 | 12/12oz | GREEN PEAS |
| 0-86069-11230-4 | S402 | 12/12oz | CUT YELLOW CORN |
| 0-86069-11260-1 | S708 | 12/10oz. | BROCCOLI FLORETS |
| 0-86069-11270-0 | S806 | 12/12oz | MIXED VEGETABLES |
| 0-86069-11275-5 | S814 | 12/10oz. | CALIFORNIA BLEND |
| 0-86069-11280-9 | S826 | 12/12oz | SUMMER BLEND |
| 0-86069-11290-8 | S862 | 12/10oz. | ITALIAN BLEND |
| 0-86069-20001-8 | 10299 | 12/1# | Speckled Butter Beans |
| 0-86069-20012-4 | 11299 | 12/1# | Baby Lima Beans |
| 0-86069-20021-6 | 12499 | 12/1# | Cut Green Beans |
| 0-86069-20341-5 | 13299 | 12/1# | Italian Green Beans |
| 0-86069-20043-8 | 21299 | 12/1# | Blackeye Peas |
| 0-86069-20051-3 | 24299 | 12/1# | Field Peas w/ Snaps |
| 0-86069-20006-3 | 25699 | 12/1# | Butter Beans |
| 0-86069-20063-6 | 25299 | 12/1# | Butter Peas |
| 0-86069-20071-1 | 30399 | 12/1# | Cut Okra |
| 0-86069-20351-4 | 31299 | 12/1# | Baby Whole Okra |
| 0-86069-20076-6 | 32399 | 12/1# | Breaded Okra |
| 0-86069-20101-5 | 40299 | 12/1# | Cut Yellow Corn |
| 0-86069-20301-9 | 50299 | 12/1# | Sliced Yellow Squash |
| 0-86069-10530-6 | 543 | 18/ 12 oz | Chopped Vidalia Onions |
| 0-86069-20296-8 | 60399 | 12/1# | Sliced Carrots |
| 0-86069-20356-9 | 65999 | 12/1# | Brussel Sprouts |
| 0-86069-20142-8 | 70399 | 12/1# | Broccoli Cuts |
| 0-86069-25070-9 | 77499 | 12/1# | Mustard Greens |
| 0-86069-20081-0 | 80699 | 12/1# | Mixed Vegetables |
| 0-86069-20013-1 | 81499 | 12/1# | California Blend |
| 0-86069-20151-0 | 83399 | 12/1# | Vegetable Gumbo |
| 0-86069-20431-3 | 89899 | 12/1# | Seasoning Blend |
| 0-86069-21271-4 | 84299 | 12/1# | Stew Mix |
| 0-86069-25041-9 | 77680 | 12/1# | Collard Greens |
| 0-86069-25051-8 | 77780 | 12/1# | Turnip Greens |
| 0-86069-25061-7 | 77899 | 12/1# | Turnip Greens w/Diced Turnips |
| 0-86069-25091-4 | 7791 | 18/12 oz | Chopped Spinach |

| Jamba At Home Smoothie Products | | | | | |
|---|---|---|---|---|---|
| UPC | JAMBA ITEM | PACK | | | "BEST BY DATE" |
| CODE | NUMBER | SIZE | DESCRIPTION | PRODUCTION CODE | |
| 8-84038-85098-7 | 85098 | 8/8oz | Strawberries Wild | 72644AH01 *thru* 71075AH01 | 18 Mar 2016 *thru* 17 Oct 2016 |
| 8-84038-85100-7 | 85100 | 8/8oz | Razzmatazz | 72644AH01 *thru* 71075AH01 | 18 Mar 2016 *thru* 17 Oct 2016 |
| 8-84038-85099-4 | 85099 | 8/8oz | Mango-A-Go-Go | 72644AH01 *thru* 71075AH01 | 18 Mar 2016 *thru* 17 Oct 2016 |
| 8-84038-85168-7 | 85168 | 8/8oz | Orange Dream Machine | 72644AH01 *thru* 71075AH01 | 18 Mar 2016 *thru* 17 Oct 2016 |
| 8-84038-85169-4 | 85169 | 8/8oz | Caribbean Passion | 72644AH01 *thru* 71075AH01 | 18 Mar 2016 *thru* 17 Oct 2016 |
| 8-84038-85102-1 | 85102 | 8/8oz | Green Fusion | 72644AH01 *thru* 71075AH01 | 18 Mar 2016 *thru* 17 Oct 2016 |
| 8-84038-85167-0 | 85167 | 8/8oz | Red Fusion | 72644AH01 *thru* 71075AH01 | 18 Mar 2016 *thru* 17 Oct 2016 |
| 8-84038-85166-3 | 85166 | 8/8oz | Blue Fusion | 72644AH01 *thru* 71075AH01 | 18 Mar 2016 *thru* 17 Oct 2016 |

66.     On this news, Inventure's market capitalization plunged nearly 25%, or $2.88 per share, on April 23-24, 2015, to close at $8.71 compared to the April 22, 2015 trading day's closing of $11.59, erasing almost $56.3 million in market capitalization in two days. To date, Inventure's stock price has never recovered and currently trades at about $6, or approximately half of the $12 Offering price.

67.     Although the press release disclosed that the Listeria came from the Jefferson Facility, the release failed to disclose the full extent of the unsanitary and dilapidated conditions at the facility.  Further, as detailed herein, the Company has never disclosed that the Jefferson Facility remains dilapidated and continues to be plagued with similar problems that led to the 2015 Listeria contamination and Recall, or the fact that the FDA again found Listeria at the facility in July 2016.

## DAMAGES TO INVENTURE

68.     As a result of the Individual Defendants' improprieties, Inventure disseminated improper public statements concerning the Company's food safety, the true state of the Company's manufacturing facilities, and the Board's oversight of operations. These improper statements have devastated Inventure's credibility as reflected by the Company's more than $56.3 million, or nearly 25%, market capitalization loss.  Further, the gross profit of Inventure's frozen products segment fell $29.6 million, ***over 90%***, in

the 2015 fiscal year compared to the 2014 fiscal year results, and the Recall cost Inventure over $17 million in expenses as well as an asset impairment charge of $9.3 million.

69.    Inventure's performance issues also damaged its reputation within the business community and in the capital markets.  In addition to price, Inventure's current and potential customers consider a food manufacturer's ability to maintain clean and sanitary facilities and ensure the safety of its customers.  Customers are less likely to purchase foods that have known safety concerns and/or have been subject to recalls.  Inventure's ability to maintain customers and attract new customers in the future is now impaired.  In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

70.    Further, as a direct and proximate result of the Individual Defendants' actions, Inventure has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)    costs incurred from defending and paying any settlement in the Securities Class Action for violations of federal securities laws; and

(b)    costs incurred from compensation and benefits paid to the Individual Defendants who have breached their duties to Inventure.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

71.    Plaintiff brings this action derivatively in the right and for the benefit of Inventure to redress injuries suffered, and to be suffered, by Inventure as a direct result of the violations of securities laws, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Inventure is named as a nominal defendant solely in a derivative capacity.

72.    Plaintiff will adequately and fairly represent the interests of Inventure in enforcing and prosecuting its rights.

73.    Plaintiff was a stockholder of Inventure at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Inventure stockholder.

74.    The current Board of Inventure consists of the following seven individuals: defendants McDaniel, Cole, Asensio, Edmonson, Lapadat, and Edwards and non-defendant Joel D. Stewart.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants McDaniel, Cole, Asensio, Edmonson, Lapadat, and Edwards Face a Substantial Likelihood of Liability for Their Misconduct**

75.    The principal duty of the Board is to ensure that the Company operates in compliance with all applicable laws and regulations.  Defendants McDaniel, Cole, Asensio, Edmonson, Lapadat, and Edwards face a substantial likelihood of liability for repeatedly failing to comply with this duty.

76.    As alleged above, current Board members—defendants McDaniel, Cole, Asensio, Edmonson, Lapadat, and Edwards—violated section 14(a) of the Exchange Act by at least negligently making the misstatements and omissions in the 2015 Proxy and 2016 Proxy (collectively, the "2015 and 2016 Proxies").  Accordingly, demand is excused because a majority of the Board faces a substantial likelihood of liability.

77.    These Director Defendants further breached their fiduciary duties of loyalty by causing or allowing improper statements in the Company's press releases and SEC filings regarding Inventure's purported "state-of-the-art" facilities, the Company's compliance with various rules and regulations, and the Board's oversight of food safety and internal controls.  The Company's facilities were not "state-of-the-art," the Company operated in violation of USDA and FDA rules and regulations, and the Board utterly lacked adequate oversight.  As alleged above, prior to the Recall, these Director Defendants failed to ensure adequate reporting controls were in place at Inventure to keep

them apprised of unsanitary conditions at the Jefferson Facility.  Following the Recall, these defendants utterly failed to ensure the Jefferson Facility timely and adequately addressed the problems, thus leading to at least one more incident of Listeria contamination.

78.     Moreover, the acts complained of constitute violations of the fiduciary duties owed by Inventure's officers and directors and these acts are incapable of ratification.

79.     Inventure has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Inventure any part of the damages Inventure suffered and will suffer thereby.

80.     Plaintiff has not made any demand on the other stockholders of Inventure to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     Inventure is a publicly held company with over 19.6 million shares outstanding and thousands of stockholders;

(b)     making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)     making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

**Against Defendants McDaniel, Cole, Asensio, Edmonson, Lapadat, Edwards, and Meyers for Violation of Section 14(a) of the Exchange Act**

81.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

82.     The section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants.  The section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the non-fraud claims.

83.     The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2015 and 2016 Proxies.  The 2015 and 2016 Proxies contained proposals to Inventure's stockholders urging stockholders to re-elect the members of the Board.  The 2015 and 2016 Proxies, however, misrepresented and failed to disclose: (i) that there were significant deficiencies in Inventure's food safety controls; (ii) the Company's past and continuing non-compliance with USDA and FDA rules and regulations concerning food safety; (iii) the significant reporting failures that failed to timely apprise the Board of serious food safety concerns at the Jefferson Facility; and (iv) the Board's continuing failure to ensure that the Company timely and adequately addressed and repaired the Jefferson Facility.  By reasons of the conduct alleged herein, the Director Defendants violated section 14(a) of the Exchange Act.  As a direct and proximate result of these Director Defendants' wrongful conduct, Inventure misled and/or deceived its stockholders by making misleading statements that were an essential link in stockholders heeding Inventure's recommendation to re-elect the current Board.

84.     The misleading information contained in the 2015 and 2016 Proxies was material to Inventure's stockholders in determining whether or not to elect the Director Defendants, approve certain executive compensation, and determine whether the Company should adopt a policy to require an independent Chairman.  This information was also material to the integrity of the directors that were proposed for election to the Board.  The proxy solicitation process in connection with the 2015 and 2016 Proxies were essential links in the re-election of nominees to the Board.

85.    Plaintiff, on behalf of Inventure, thereby seeks relief for damages inflicted upon the Company based upon the misleading 2015 and 2016 Proxies in connection with the improper re-election of the members of the Board, approval of executive compensation, and vote against stockholder proposals for the Company to adopt a policy to require an independent Chairman.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

86.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

87.    The Individual Defendants owed and owe Inventure fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Inventure the highest obligation of good faith, fair dealing, loyalty, and due care.

88.    The Individual Defendants violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Inventure, and/or consciously failing to prevent to Company from engaging in the unlawful acts complained of herein.

89.    The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration. The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) for years, there were significant deficiencies in Inventure's food safety controls and internal reporting controls; (ii) for years, the Company failed to comply with USDA and FDA rules and regulations concerning food safety; (iii) for years, the Jefferson Facility was poorly maintained and unsanitary conditions significantly jeopardized food safety; and (iv) the Individual Defendants' public statements about Inventure's business, including with respect to the Offering, were misleading. Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

90.     The Director Defendants, as directors of the Company, owed Inventure the highest duty of loyalty.  These defendants breached their duty of loyalty by recklessly permitting the improper activity detailed herein.  The Director Defendants knew or were reckless in not knowing that: (i) for years, there were significant deficiencies in Inventure's food safety controls and internal reporting controls; (ii) for years, the Company failed to comply with USDA and FDA rules and regulations concerning food safety; (iii) for years, the Jefferson Facility was poorly maintained and unsanitary conditions significantly jeopardized food safety; and (iv) the Individual Defendants' public statements about Inventure's business, including with respect to the Offering, were misleading.  Accordingly, the Director Defendants breached their duty of loyalty to the Company.

91.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Inventure has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

92.     Plaintiff, on behalf of Inventure, has no adequate remedy at law.

## <u>COUNT III</u>

### Against the Individual Defendants for Waste of Corporate Assets

93.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

94.     As a result of the wrongdoing alleged herein and by failing to conduct proper supervision, the Individual Defendants have caused Inventure to waste its assets by destroying hundreds of thousands of pounds of contaminated food as the result of unsanitary operations, and by paying improper compensation and bonuses to certain of its executive officers and directors who breached their fiduciary duty.

95.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

96.     Plaintiff, on behalf of Inventure, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

97.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

98.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Inventure.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Inventure.

99.    Plaintiff, as a stockholder and representative of Inventure, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

100.    Plaintiff, on behalf of Inventure, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Inventure, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of defendants' violation of securities laws, breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.    Directing Inventure to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Inventure and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following Corporate Governance Policies:

1.    a proposal to strengthen the Company's food safety controls;

2.    a proposal to strengthen the Company's operational controls;

3.    a proposal to strengthen the Company's disclosure controls to

1 | ensure material information is adequately and timely disclosed to the SEC and public;

2 |        4.     a proposal to strengthen the Board's supervision and oversight of

3 | operations and develop and implement procedures for greater stockholder input into the

4 | policies and guidelines of the Board; and

5 |        5.     a provision to permit the stockholders of Inventure to nominate at

6 | least three candidates for election to the Board;

7 |     C.     Extraordinary equitable and/or injunctive relief as permitted by law, equity,

8 | and state statutory provisions sued hereunder, including attaching, impounding, imposing

9 | a constructive trust on, or otherwise restricting the proceeds of defendants' trading

10 | activities or their other assets so as to assure that plaintiff, on behalf of Inventure, has an

11 | effective remedy;

12 |     D.     Awarding to Inventure restitution from defendants, and each of them, and

13 | ordering disgorgement of all profits, benefits, and other compensation obtained by

14 | defendants;

15 |     E.     Awarding to plaintiff the costs and disbursements of the action, including

16 | reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

17 |     F.     Granting such other and further relief as the Court deems just and proper.

18 | **JURY DEMAND**

19 | Plaintiff demands a trial by jury.

20 | Dated: March  9  , 2017

SCHNEIDER WALLACE COTTRELL
  KONECKY WOTKYNS LLP
MICHAEL C. MCKAY


  /s/ Michael C. McKay        
MICHAEL C. MCKAY

8501 North Scottsdale Road, Suite 270
Scottsdale, AZ 85253
Telephone: (480) 428-0144
Facsimile: (866) 505-8036
E-mail: mmckay@schneiderwallace.com

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
FELIPE J. ARROYO

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SHANE P. SANDERS
600 B Street, Suite 1900
San Diego, CA  92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsarroyo.com
       farroyo@robbinsarroyo.com
       ssanders@robbinsarroyo.com

Attorneys for Plaintiff

1149900

VERIFICATION

I, Robert Hutton, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Stockholder Derivative Complaint for Violation of Securities Laws, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated:   2-28-17

ROBERT HUTTON