**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Robert Hutton, | No. CV-17-00727-PHX-JAT |
| Plaintiff, | **ORDER** |
| v. | |
| Terry McDaniel, et al., | |
| Defendants. | |

Pending before the Court are Nominal Defendant Inventure Foods, Inc. ("Inventure") and Defendants Terry McDaniel, Steve Weinberger, Timothy A. Cole, Ashton D. Asensio, Macon Bryce Edmonson, Paul J. Lapadat, Harold S. Edwards, David L. Meyers, and Itzhak Reichman's (the "Individual Defendants'") Motion to Dismiss Shareholder Derivative Complaint ("Motion to Dismiss," Doc. 33 at 1–24), an alternative Motion to Stay, (*id.* at 24–26), and Request for Judicial Notice, ("Request," Doc. 34). Plaintiff Robert Hutton has filed a response to both Motions, ("Response," Doc. 35), and a response to Defendants' Request, (Doc. 36). Defendants have filed respective replies. (*See* Docs. 38; 39). Finally, consistent with Plaintiff's Request for Leave to Amend if the Court grants Defendants' Motion to Dismiss, Plaintiff has filed a Proposed Verified Amended Stockholder Derivative Complaint. (Doc. 47-1). The Court now rules on Defendants' Motions and Request.

## I.     BACKGROUND

This is a shareholder derivative action on behalf of nominal party Inventure

against the company's officers and directors. (Doc. 2 at ¶ 1). Plaintiff states five claims for relief against Individual Defendants: (1) Individual Defendants breached their fiduciary duties by failing to oversee Inventure and prevent the company from engaging in unlawful acts, (*id.* at ¶¶ 86–92); (2) Defendants McDaniel, Cole, Asensio, Edmonson, Lapadat, Edwards, and Meyers (the "Director Defendants")[1] violated Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), (*id.* at ¶¶ 81–85); (3) Individual Defendants breached their fiduciary duties by disseminating false or misleading information, (*id.* at ¶¶ 86–92); (4) Individual Defendants wasted corporate assets, (*id.* at ¶¶ 93–96); and (5) Individual Defendants were unjustly enriched, (*id.* at ¶¶ 97–100).[2]

Plaintiff did not make a demand on Inventure's Board to pursue these claims before filing suit. (*Id.* at ¶ 74). Plaintiff maintains that any such demand would have been futile because the majority of Inventure's Board faces a substantial likelihood of personal liability. (*Id.* at ¶¶ 74, 75). Defendants disagree and have moved to dismiss Plaintiff's Complaint under Federal Rule of Civil Procedure ("Federal Rule") 23.1 for failure to properly plead demand futility and under Federal Rule 12(b)(6) for failure to state a viable claim for relief. (*See* Docs. 33; 38).

## A. The Parties

Inventure is a leading marketer and manufacturer of specialty snack foods. (Doc. 2 at ¶ 2). The company is incorporated in Delaware, and its principal executive offices are in Phoenix, Arizona. (*Id.* at ¶ 16). Inventure operates in two segments: frozen products and snack products. (*Id.*). The frozen products segment produces frozen fruits,

---

[1] Although Plaintiff includes Defendant Reichman in references to "Director Defendants," (*see* Doc. 2 at ¶ 26), Plaintiff also appears to use the term without referencing Defendant Reichman, (*see, e.g.*, *id.* at ¶¶ 82, 83). Because of Plaintiff's inconsistent use of the term and the fact that Defendant Reichman is no longer a director on Inventure's Board of Directors ("Inventure's Board"), the Court will not include him when referring to Director Defendants.

[2] Defendants state that "Plaintiff appears to assert a claim against all Individual Defendants for aiding and abetting unidentified Individual Defendants' putative breaches of fiduciary duty." (*See* Doc. 33 at 23–24). Defendants do not cite where—and the Court cannot find where—the Shareholder Derivative Complaint (the "Complaint") asserts this claim. Further, Plaintiff does not address this claim in his Response. Thus, the Court does not interpret the Complaint as stating this claim against Individual Defendants.

vegetables, beverages, and desserts while the snack products segment produces potato chips, kettle chips, potato crisps, potato skins, pellet snacks, and sheeted dough products. (*Id.*). Inventure has manufacturing plants in Arizona, Florida, Georgia, Indiana, Oregon, and Washington. (*Id.*).

Lead Plaintiff Robert Hutton has owned Inventure stock since at least March 13, 2014.[3] (*Id.* at ¶¶ 15, 52). Plaintiff remains a current stockholder of the company. (*Id.* at ¶ 15).

The Individual Defendants are or were officers and/or directors of the company during the relevant period. Defendant McDaniel has been Inventure's CEO and a director since May 2008. (*Id.* at ¶ 17). Defendant Weinberger has been Inventure's CFO since August 2006. (*Id.* at ¶ 18). Defendant Cole has been Inventure's Interim Chairman of the Board since January 2017 and a director since May 2014. (*Id.* at ¶ 19). Defendant Asensio has been an Inventure director since February 2006 and was Chairman of Inventure's Audit Committee from July 2006 until at least April 2016. (*Id.* at ¶ 20). Defendant Edmonson has been an Inventure director since July 2006 and was a member of Inventure's Audit Committee from at least April 2012 until May 2014. (*Id.* at ¶ 21). Defendant Lapadat has been an Inventure director since May 2013 and was a member of Inventure's Audit Committee from May 2013 until at least April 2016. (*Id.* at ¶ 22). Defendant Edwards has been an Inventure director since May 2014 and was a member of Inventure's Audit Committee from May 2014 until at least April 2016. (*Id.* at ¶ 23). Defendant Meyers was Inventure's Chairman of the Board from September 2013 until January 2017, a director from May 2013 until January 2017, and a member of Inventure's Audit Committee from May 2013 until September 2013. (*Id.* at ¶ 24). Defendant Reichman was Inventure's Chairman of the Board from May 2010 until May 2013 and a director from October 2007 until May 2014. (*Id.* at ¶ 25).

---

[3] The Complaint does not state exactly how long Plaintiff has owned Inventure stock but, rather, that he has "continuously been a stockholder since" "the time of the wrongdoing complained of." (Doc. 2 at ¶ 15). The first specified date of wrongdoing in the Complaint is March 13, 2014, when Inventure filed its allegedly misleading 2013 Form 10-K. (*Id.* at ¶ 52).

## B. Factual Background

In November 2013, Inventure acquired a frozen food packaging facility located in Jefferson, Georgia (the "Jefferson Facility"). (*Id.* at ¶¶ 4, 39). On March 13, 2014, Inventure filed its 2013 Form 10-K with the U.S. Securities and Exchange Commission (the "SEC"). (*Id.* at ¶ 52). This annual report was signed by all Inventure Board members and disclosed special obligations related to food manufacturing. (*Id.*). On or about September 17, 2014, Inventure held a secondary offering to sell Inventure stock. (*Id.* at ¶ 54). In connection with the secondary offering, Inventure filed a registration statement and prospectus supplement (the "Offering Documents") with the SEC. (*Id.*). The Offering Documents incorporated the 2013 Form 10-K and were signed by Defendants McDaniel and Weinberger. (*Id.*).

Nearly one year following Inventure's acquisition, on October 22, 2014, the Georgia Department of Agriculture (the "GDA") inspected the Jefferson Facility and "found a wide variety obvious unsanitary conditions that are known to breed dangerous bacteria and foodborne contaminants." (*Id.* at ¶ 45). On March 2, 2015, a complaint was filed with the U.S. Food and Drug Administration (the "FDA") concerning the "unsafe and unsanitary conditions" at the Jefferson Facility. (*Id.* at ¶ 46). On March 10, 2015, Inventure filed its 2014 Form 10-K with the SEC. (*Id.* at ¶ 53).

On April 17, 2015, the GDA and FDA conducted a joint inspection of the Jefferson Facility. (*Id.* at ¶ 47). This inspection lasted eight hours and discovered "unsanitary and unsafe conditions substantially similar to the" GDA's October 2014 inspection findings. (*Id.*). A few days later, on April 21, Inventure filed a Proxy Statement with the SEC. (*Id.* at ¶ 57). The 2015 Proxy Statement solicited stockholder votes to elect or re-elect Inventure's seven directors. (*Id.*; Doc. 33-3 at 8). One day later, on April 22, Inventure's Board met to discuss food safety issues at the Jefferson Facility. (Doc. 2 at ¶ 48). Also on April 22, Inventure's Board approved a press release that was released on April 23. (*Id.*). The press release announced that Inventure was initiating a voluntary "recall of nearly 200,000 pounds of food manufactured in the Jefferson

Facility" (the "Recall"). (*Id.* at ¶ 49). The press release explained that there was a finding of Listeria monocytogenes ("Listeria") in its Jefferson Facility. (*Id.* at ¶ 65). The press release continued that "Listeria is an organism that can cause infections in young children, frail or elderly people, and others with weakened immune systems." (*Id.*). Over the next two days, Inventure's share price dropped from $11.59 to $8.71 per share. (*Id.* at ¶ 66). On June 23, 2015, the GDA inspected the Jefferson Facility and reported that "all [food safety] violations had been corrected as of that date." (*Id.* at ¶ 51).

On July 1, 2015, the GDA informed Inventure "that water samples at the . . . Jefferson Facility tested positive for coliform bacteria[,] . . . the standard indicator of insanitary conditions in drinking water." (*Id.* at ¶ 52). Inventure filed its 2015 Form 10-K with the SEC on March 10, 2016. (*Id.* at ¶ 53). A month later, on April 11, Inventure filed a 2016 Proxy Statement with the SEC. (*Id.* at ¶ 61). The 2016 Proxy Statement solicited stockholder votes to elect or re-elect Inventure's seven directors. (*Id.*; Doc. 33-4 at 8).

The FDA again inspected the Jefferson Facility between June 20 and 24, 2016. (Doc. 2 at ¶ 51). On July 8, 2016, the FDA "informed Inventure that [it] found Listeria on twelve of ninety-nine individual swabs taken from the Jefferson Facility." (*Id.*). Following receipt of this information, Inventure destroyed the contaminated food, all of which had not yet been shipped into the marketplace. (*Id.* at ¶¶ 9, 51).

Plaintiff subsequently made a demand pursuant to Delaware Code Annotated Title 8, Section 220 (a "Section 220 demand") on Inventure.[4] (*Id.* at ¶ 4). After receiving documents pursuant to the Section 220 demand, Plaintiff commenced this action.

## II.    DEFENDANTS' REQUEST FOR JUDICIAL NOTICE

Defendants request the Court take judicial notice over six documents or facts, or,

---

[4] A Section 220 demand is the right of "[a]ny stockholder . . . to inspect for any proper purpose . . . [t]he corporation's . . . books and records," and requires a stockholder only to establish "some credible basis" that the demand "is based on more than mere suspicion and conjecture." *Okla. Firefighters Pension & Ret. Sys. v. Citigroup Inc.*, Civ. No. 9587-ML, 2015 WL 1884453, at *5 (Del. Ch. Apr. 24, 2015); *see* Del. Code Ann. tit. 8, § 220(b)(1).

alternatively, consider them under the doctrine of incorporation by reference: (1) Inventure's November 12, 2013 press release filed with the SEC as an attachment to a Form 8-K, (Doc. 34-1); (2) Inventure's April 23, 2015 press release filed with the SEC as an attachment to a Form 8-K, (Doc. 34-2); (3) Inventure's 2015 Proxy Statement, (Doc. 34-3); (4) Inventure's 2016 Proxy Statement, (Doc. 34-4); (5) *BSL Investments, II, LLC v. Fresh Frozen Foods, Inc.*, No. 1:15-CV-2136-AT, 2016 WL 9008197 (N.D. Ga. June 16, 2016), *aff'd*, 679 F. App'x 979 (11th Cir. 2017) (per curiam), (Doc. 34-5); and (6) a second amended complaint filed in the Superior Court of Arizona in Maricopa County case *Westmoreland County Employee Retirement Fund v. Inventure Foods, Inc.*, No. CV2016-002718. (Doc. 34 at 1–4). Defendants also attach the following three exhibits to their Reply: (1) Inventure's October 28, 2014 Board Meeting Minutes, (Doc. 38-1); (2) Inventure's April 22, 2015 Board Meeting Minutes, (Doc. 38-2); and (3) the GDA Manufactured Food Inspection Form from the GDA's October 22, 2015 Jefferson Facility inspection, (Doc. 38-3). Plaintiff does not dispute the authenticity of any of these documents or facts but, rather, argues that the Court should deny Defendants' requests "to the extent Defendants are seeking judicial notice of the truth of the contents of these documents." (Doc. 36 at 4).

While a motion to dismiss is ordinarily limited to the allegations in the complaint, other documents may be considered if their "'authenticity . . . is not contested' and the plaintiff's complaint necessarily relies on them." *Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001) (quoting *Parrino v. FHP, Inc.*, 146 F.3d 699, 705–06 (9th Cir. 1998)). A court may take judicial notice of information "not subject to reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determine from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). "A court shall take judicial notice if requested by a party and supplied with the necessary information." *Id.* at 201(d).

Under the incorporation by reference doctrine, if a document is referenced in a complaint, a court may "properly consider the [document] in its entirety." *In re NVIDIA*

*Corp. Sec. Litig.*, 768 F.3d 1046, 1058 n.10 (9th Cir. 2014); *see also City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1107 (E.D. Wash. 2013) ("Once a document is deemed incorporated by reference, the entire document is assumed to be true for purposes of a motion to dismiss, and both parties—and the Court—are free to refer to any of its contents."). Specifically, courts may take into account "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading." *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

Defendants request that the Court deem Plaintiff's Complaint to have incorporated some of Defendants' proffered documents by reference. (Doc. 34 at 2–3). In particular, the Complaint refers to Inventure's 2015 Proxy Statement, (Doc. 2 at ¶ 41), 2016 Proxy Statement, (*id.*), the April 23, 2015 press release, (*id.* at ¶¶ 48–49, 65, 67), Inventure's October 28, 2014 Board Meeting Minutes, (*id.* at ¶ 45), Inventure's April 22, 2015 Board Meeting Minutes, (*id.* at ¶ 48), and the October 22, 2014 GDA inspection form, (*id.* at ¶ 45). Plaintiff does not contest the authenticity of these documents and, thus, the Court will deem these three documents to be incorporated by reference. The Court will "treat [these] document[s] as part of the complaint, and . . . assume that [their] contents are true for purposes of" Defendants' Motion to Dismiss. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

Defendants' remaining proffered documents are appropriate for judicial notice. Courts routinely take judicial notice of such things as public SEC filings, corporate press releases, and court proceedings. *See, e.g.*, *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 864 (N.D. Cal. 2004). Further, Plaintiff does not dispute the authenticity of any of these documents. Thus, the Court will take judicial notice of the existence—but not the truth of the facts recited therein—of the November 12, 2013 press release, the specified orders in the *BSL Investments, II, LLC* case, and the second amended complaint filed in the *Westmoreland* case[5]. *See Klein v. Freedom Strategic*

---

[5] Although Defendants requested the Court to take judicial notice of the second

*Partners*, 595 F. Supp. 2d 1152, 1157 (D. Nev. 2009) ("When a court takes judicial notice of a public record, 'it may do so not for the truth of the facts recited therein, but for the existence of the [record], which is not subject to reasonable dispute over its authenticity.'" (quoting *Lee*, 250 F.3d at 690)).

## III.  MOTION TO DISMISS PURSUANT TO FEDERAL RULE 23.1

Plaintiff acknowledges that no pre-suit demand was made upon Inventure's Board. (Doc. 2 at ¶¶ 75–79). Defendants move to dismiss the Complaint on the grounds that Plaintiff was required to create a reasonable doubt that a majority of Inventure's Board could have remained independent and disinterested in responding to Plaintiff's demand, and Plaintiff has failed to adequately plead that a majority of the directors on Inventure's Board was incapable of responding to a demand.[6] (*See* Doc. 33 at 1–13). In particular, Defendants argue that Plaintiff has failed to allege particularized facts that would show Director Defendants face a substantial risk of liability relating to Plaintiff's claims. (*See id.*; *see also* Doc. 2 at ¶¶ 75, 76).

### A.  Demand Futility Legal Standard

"The derivative form of action permits an individual shareholder to bring 'suit to enforce a *corporate* cause of action against officers, directors, and third parties.'" *Kamen*

---

amended complaint filed in the *Westmoreland* case, Defendants did not attach the complaint to their Request. Based on the provided case number, the Court found that a minute entry on the Superior Court of Arizona in Maricopa County website states that a second amended complaint was filed in the *Westmoreland* case on March 27, 2017. Besides taking judicial notice of the filing of the second amended complaint, the Court declines to take judicial notice of the existence of any substantive content of the second amended complaint because Defendants have failed to supply the Court "with the necessary information." *See* Fed. R. Evid. 201(c)(2).

[6] Plaintiff must plead demand futility as against the majority of directors on Inventure's Board. *See In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 124–25 (Del. Ch. 2009). When Plaintiff filed his Complaint, Inventure's Board was composed of seven board members: Director Defendants and Joel Stewart, who is not a defendant in this action and, thus, disinterested as a matter of law. (Docs. 2 at ¶ 74; 33 at 7); *see In re First Solar Derivative Litig.*, No. CV-12-00769-PHX-DGC, 2016 WL 3548758, at *5 (D. Ariz. June 30, 2016) ("As already noted, the current board includes four individuals who joined after the events at issue in this case. These individuals are considered disinterested as a matter of law." (citing *Sandys v. Pincus*, No. CV 9512-CB, 2016 WL 769999, at *15 (Del. Ch. Feb. 29, 2016))). Thus, Plaintiff must plead that demand would have been futile as to four of Inventure's remaining six directors.

*v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991) (emphasis in original) (quoting *Ross v. Bernhard*, 396 U.S. 531, 534 (1970)). "Devised as a suit in equity, the purpose of the derivative action was to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of 'faithless directors and managers.'" *Id.* (quoting *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 548 (1949)).

However, there are limits to a shareholder's use of this derivative right. Use of the derivative right is unavailable unless the shareholder: "(a) has first demanded that the directors pursue the corporate claim and the directors have wrongfully refused to do so; or (b) establishes that pre-suit demand is excused because the directors are deemed incapable of making an impartial decision regarding the pursuit of the litigation." *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008). "The purpose of the demand requirement is to affor[d] the directors an opportunity to exercise their reasonable business judgment and waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting on such right." *Kamen*, 500 U.S. at 96 (quotation marks omitted).

Federal Rule 23.1 codifies this demand requirement in requiring that a shareholder derivative complaint "state with particularity: . . . any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and . . . the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b). Although Federal Rule 23.1 provides the pleading standard required in a derivative action complaint, it does not provide the substantive rule for assessing what reasons are sufficient to excuse demand on the corporation. *See Rosenbloom v. Pyott*, 765 F.3d 1137, 1148 (9th Cir. 2014). The state of incorporation provides this substantive rule. *Kamen*, 500 U.S. at 109. Here, Inventure's state of incorporation is Delaware. (Doc. 2 at ¶ 16).

Under Delaware law, a plaintiff complaining of board inaction and attempting to plead demand futility must allege "particularized facts that 'create a reasonable doubt

that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand.'" *In re Citigroup*, 964 A.2d at 120 (quoting *Rales v. Blasband*, 634 A.2d 927, 933–34 (Del. 1993)); *see also* Del. Ch. Ct. R. 23.1. In other words, demand is excused if a plaintiff can show that a majority of directors on the board are interested in the alleged wrongdoing, not independent, or would face a "substantial likelihood" of liability if a lawsuit was filed. *Rales*, 634 A.2d at 936. To establish that a director faces a "substantial risk of liability," a plaintiff need only "make a threshold showing, through the allegation of particularized facts, that [his] claims have some merit." *Id.* at 934.

The particularity requirement in both Federal Rule 23.1 and Delaware Chancery Court Rule ("Delaware Rule") 23.1 creates a heightened pleading standard. When a court considers a motion to dismiss for failure to comply with the demand requirements of Federal Rule 23.1 and Delaware Rule 23.1, "[p]laintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged, but conclusory allegations are not considered as expressly pleaded facts or factual inferences." *Rosenbloom*, 765 F.3d at 1148 (quotation marks omitted).

### 1. Duty of Oversight

Plaintiff alleges that demand is excused on his oversight claim because Director Defendants face a substantial likelihood of personal liability for failing to adequately oversee Inventure's food safety controls. (Doc. 2 at ¶¶ 77, 78). In particular, Plaintiff asserts that Director Defendants failed to exercise oversight over Inventure in two ways: (1) failing to implement an adequate system of internal controls, thereby preventing the Directors from being "aware of serious food safety risks and from acting to improve the deficient food safety controls," (Doc. 35 at 21 n.15; *see also* Docs. 2 at ¶ 77; 35 at 18–22); and (2) failing to "timely and meaningfully address known significant food safety hazards" at the Jefferson Facility following the waving of various red flags, (Doc. 35 at 22; *see also* Docs. 2 at ¶ 77; 35 at 22–24). Defendants generally argue that Plaintiff's

oversight claim fails because it is not supported by particularized facts. (*See* Doc. 38 at 7–8).

The allegations that Director Defendants failed to prevent harm to Inventure is called a *Caremark* claim. *Stone v. Ritter*, 911 A.2d 362, 369–70 (Del. 2006) (discussing *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996)). Delaware courts have observed that this type of "failure of oversight" theory is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *In re Caremark*, 698 A.2d at 967. A *Caremark* claim "requires a showing that the directors breached their duty of loyalty by failing to attend to their duties in good faith." *Guttman v. Jen-Hsun Huang*, 823 A.2d 492, 506 (Del. Ch. 2003). "Put otherwise, the decision premises liability on a showing that the directors were conscious of the fact that they were not doing their jobs." *Id.* To excuse demand based on an asserted *Caremark* claim, a plaintiff must plead particularized facts demonstrating, with "some merit," that the directors: (a) "utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Stone*, 911 A.2d at 370 (emphasis in original). Here, Plaintiff has attempted to plead theories under both *Caremark* prongs.

### a. Utter Failure to Implement Internal System or Controls

Plaintiff first presents an argument under the first *Caremark* prong, stating that Director Defendants utterly failed to adopt any reporting and compliance systems.[7]

---

[7] The Court notes that Plaintiff's allegations and arguments involving the first *Caremark* prong are anything but clear. Plaintiff charges "that the Inventure Board utterly failed to implement 'reporting or information system or controls.'" (Doc. 35 at 20). However, elsewhere, Plaintiff appears to admit that reporting or information system or controls were implemented but encumbered by "deficiencies." (*See, e.g.*, Doc. 2 at ¶¶ 18–25, 89, 90). Thus, Plaintiff apparently concedes that Inventure's Board did not "utterly" fail to adopt or implement any reporting and compliance systems. *See Horman v. Abney*, C.A. No. 12290-VCS, 2017 WL 242571, at *8 n.46 (Del. Ch. Jan. 19, 2017) (recognizing in the *Caremark* context that the term "*[u]tterly failed* is a linguistically extreme formulation" representing "absolute" or "total" failure (quotation marks and citations omitted) (emphasis added)). Nevertheless, the Court will overlook Plaintiff's apparent concessions and analyze Plaintiff's argument that the Inventure Board utterly failed to implement a reporting or information system or controls.

(Doc. 35 at 18–22). Plaintiff alleges that the documents produced in response to his Section 220 demand reveal an absence of any Inventure Board minutes or other Board materials relating to the monitoring of compliance with food safety regulations at the Jefferson Facility. (*Id.*). Plaintiff contends that the informational void supports a reasonable inference that Inventure's Board "conscious[ly] fail[ed] to ensure that it was informed about key food safety risks necessary for legal and regulatory compliance." (*Id.* at 22).

Delaware law does not require a board of directors to "monitor the monitors" after implementing a "well-constituted monitoring and reporting system." *Horman*, 2017 WL 242571, at *9. Thus, "even if the reporting systems [a board] implemented and relied upon, without reason to suspect they were not working, did not ultimately detect corporate wrongdoing or bring [such wrongdoing] to their attention," a board cannot nonetheless be liable for breaching its fiduciary duties simply because such wrongdoing occurred. *Id.* In other words, under Delaware law, "[g]ood faith, not a good result, is what is required of the board." *In re Goldman Sachs Grp., Inc. S'holder Litig.*, No. 5215-VCG, 2011 WL 4826104, at *23 (Del. Ch. Oct. 12, 2011); *see also David B. Shaev Profit Sharing Account v. Armstrong*, No. Civ.A. 1449-N, 2006 WL 391931, at *5 (Del. Ch. Feb. 13, 2006) ("But the one thing that is emphatically not a *Caremark* claim is the bald allegation that directors bear liability where a concededly well-constituted oversight mechanism, having received no specific indications of misconduct, failed to discover fraud.").

Here, Plaintiff relies on a lack of documents produced following his Section 220 demand to allege that Inventure's Board failed to implement a system of internal controls. For example, Plaintiff alleges "of the thirty-eight Board minutes produced by the Company dated between 2013 and 2016, not one of them referenced the numerous violations at the Jefferson Facility prior to the acquisition or the October 2014 Inspection, including minutes for a Board meeting that occurred on October 28, 2014, the week after the October 2014 Inspection." (Doc. 2 at ¶ 45). Based on this lack of information,

Plaintiff argues that the Court should reasonably infer that Director Defendants may be substantially liable for breaching its oversight duties. (Doc. 35 at 20).

The Court finds Plaintiff's argument unpersuasive. As a threshold matter, the October 28, 2014 meeting minutes cited by Plaintiff do not explicitly state that Inventure's Board discussed Jefferson Facility's food safety issues; however the minutes similarly do not preclude that such a discussion occurred. (*See* Doc. 38-1). For example, the October 28 minutes reflect that Defendant McDaniel provided an overview of Inventure's "operational successes and challenges year to date" and reported "on the year to date results for the Snack and Frozen divisions." (*Id.* at 2–3). Plaintiff relies solely on these vague and amorphous descriptions in arguing that Inventure's Board never discussed the Jefferson Facility's food safety issues. *See, e.g.*, *eBay Domestic Holdings, Inc. v. Newmark*, Civil Action No. 3705-CC, 2009 WL 3494348, at *3 (Del. Ch. Oct. 29, 2009) (recognizing that "[b]oard minutes contain high-level statements and are often generic in nature"). Thus, Plaintiff asks the Court to make two inferences: (1) the generalized Board minutes rule out that any discussion regarding the Jefferson Facility food safety issues took place; and (2) the lack of discussion is tantamount to a breach of Director Defendants' oversight duties.

Next, Plaintiff has failed to cite to any case where a court has held that an allegation premised upon the absence of Section 220 records discussing a board's oversight—standing alone—meets the particularized allegations standard under Federal Rule 23.1. To the contrary, at least one Delaware court has held the opposite. *See Horman*, 2017 WL 242571, at *10 ("That the [p]laintiffs did not turn up any [b]oard documents specifically referencing continued compliance with [a governmental agreement] during a specific time period is not sufficient to allege that the system [of internal controls] was not in place . . . ."). Plaintiff instead cites *In re China Agritech, Inc. Shareholder Derivative Litigation*, in which the Court of Chancery of Delaware reasonably drew inferences of defendants' bad faith from the absence of produced books and records relating to audit committee meetings. C.A. No. 7163-VCL,

2013 WL 2181514, at *17 (Del. Ch. May 21, 2013). However, the *China Agritech* court noted that this "reasonable inference" was "reinforced" by the plaintiffs' other allegations, including: a letter from an outside auditor indicating an "illegal act" had occurred and that management had not yet taken "timely and appropriate remedial action"; discrepancies between public filings filed with governmental agencies; and implications from a proxy statement. *See id.* at *18–22; *see also In re Tyson Foods, Inc.*, 919 A.2d 563, 577–78 (Del. Ch. 2007) (inferring that a board never reviewed documents based on *both* the absence of information in records produced following a Section 220 demand *and* "detailed allegations" relating to an SEC Order and "logo vendor transactions").

Here, unlike the plaintiffs in *China Agritech* or *In re Tyson*, Plaintiff relies solely on the absence of books and records following the Section 220 demand—rather than additional, particularized factual allegations—to allege that Director Defendants face a substantial risk of liability for utterly failing to implement any reporting or information system or controls. Plaintiff has not met his burden, and, therefore, demand on Inventure's Board cannot be excused as futile based on the first *Caremark* prong. *See, e.g.*, *In re Gen. Motors Co. Derivative Litig.*, C.A. No. 9627-VCG, 2015 WL 3958724, at *14 (Del. Ch. June 26, 2015) ("Contentions that the [b]oard did not receive specific types of information do not establish that the [b]oard utterly failed to attempt to assure a reasonable information and reporting system exists . . . ." (quotation marks and citations omitted)); *Armstrong*, 2006 WL 391931, at *6 (holding that it is not enough for a plaintiff to plead "some hypothetical, especially zealous, board might have discovered and stopped the conduct complained of" to impose oversight liability).

### b. Director Defendants' Conscious Disregard of Red Flags

Plaintiff next argues demand futility under the second *Caremark* prong. To establish demand futility under the second *Caremark* prong, a plaintiff must plead "(1) that the directors knew or should have known that the corporation was violating the law, (2) that the directors acted in bad faith by failing to prevent or remedy those

violations, and (3) that such failure resulted in damage to the corporation." *Melbourne Mun. Firefighters' Pension Tr. Fund v. Jacobs*, C.A. No. 10872-VCMR, 2016 WL 4076369, at *8 (Del. Ch. Aug. 1, 2016) (citing *In re Caremark*, 698 A.2d at 971). Plaintiffs often attempt to satisfy the elements of a *Caremark* claim by "plead[ing] [particularized facts] that the board knew of evidence of corporate misconduct—the proverbial 'red flag'—yet acted in bad faith by consciously disregarding its duty to address that misconduct." *Reiter ex rel. Capital One Fin. Corp. v. Fairbank*, C.A. No. 11693-CB, 2016 WL 6081823, at *8 (Del. Ch. Oct. 18, 2016). In this context, bad faith means "'the directors were conscious of the fact that they were not doing their jobs,' and that they ignored 'red flags' indicating misconduct in defiance of their duties." *Armstrong*, 2006 WL 391931, at *5 (quoting *Guttman*, 823 A.2d at 506–07). Here, Plaintiff alleges four red flags, which purportedly form the basis for Director Defendants' substantial likelihood of oversight liability, including the following: (1) pre-acquisition food safety problems at the Jefferson Facility between 2009 and 2012; (2) the October 22, 2014 GDA finding of unsanitary conditions at the Jefferson Facility; (3) the March 2, 2015 FDA complaint; and (4) the April 23, 2015 Recall.[8]

### i. Pre-Acquisition Food Safety Violations

Plaintiff's first proffered red flag is the pre-acquisition Jefferson Facility food safety violations occurring between 2009 and 2012. (Docs. 2 at ¶¶ 44, 77, 90; 35 at 11, 19). These violations were recognized by both the FDA and the GDA and provided to Inventure "during due diligence when Inventure acquired Fresh Frozen Foods." (Doc. 2 at ¶ 44).

---

[8] The Court notes that only the fourth of these red flags is explicitly pled in the Complaint under *Caremark*'s second prong. (*See* Doc. 2 at ¶ 77 ("Following the Recall, these defendants utterly failed to ensure the Jefferson Facility timely and adequately addressed the problems, thus leading to at least one more incident of Listeria contamination.")). However, the Complaint also contains vague allegations that Director Defendants violated their "fiduciary duties" for the "acts complained of." (*Id.* at ¶ 78). Because the Complaint—and Plaintiff's Response—details Director Defendants' inaction in response to the pre-acquisition violations, the October 22, 2014 GDA finding, and March 2, 2015 FDA complaint, the Court construes the Complaint as alleging that Director Defendants face a substantial likelihood of liability based on all four red flags.

"[T]he red flag analogy depicts events or reports that serve as warning signs to the [b]oard of corporate wrongdoing after a system of reporting and compliance is in place." *Horman*, 2017 WL 242571, at *11. "These red flags put the board on notice that the system is not working properly." *Id.*

Here, the pre-acquisition food safety violations at the Jefferson Facility do not constitute red flags obligating Director Defendants to act. Because the Jefferson Facility was not operating under Inventure's system of internal controls, the pre-acquisition violations could not wave a red flag indicating to Director Defendants that their system of internal controls was inadequately operating. *See, e.g.*, *In re Intel Corp. Derivative Litig.*, 621 F. Supp. 2d 165, 175 (D. Del. 2009) (noting that a prior finding of wrongdoing could not be "a 'red flag' that the [company's d]irectors allegedly disregarded at their peril"). Additionally, to the extent that Plaintiff argues that these prior violations required Director Defendants to be on a heightened notice for food safety violations at the Jefferson Facility, Plaintiff has failed to cite—and the Court cannot find—any authority for this argument. Indeed, at least one court has held that past illegal activity does not heighten directors' duties. *See, e.g.*, *Zomolosky v. Kullman*, 70 F. Supp. 3d 595, 605–06 (D. Del. 2014) (refusing to infer a "pattern of unlawful infringement" or "red flags" from earlier findings of patent infringement).

### ii.    GDA Finding and FDA Complaint

Plaintiff next alleges that the October 22, 2014 GDA finding, (*see* Doc. 2 at ¶¶ 5, 45), and the March 2, 2015 FDA complaint, (*see id.* at ¶¶ 6, 46), were red flags. (Doc. 35 at 19–20).

"Under Delaware law, red flags are only useful when they are either waved in one's face or displayed so that they are visible to the careful observer." *Wood v. Baum*, 953 A.2d 136, 143 (Del. 2008) (quotation marks omitted). Thus, courts have often refrained from finding that demand is futile where a plaintiff has failed to allege that director defendants knew about red flags. *See In re Johnson & Johnson Derivative Litig.*, 865 F. Supp. 2d 545, 575 (D. N.J. 2011) ("Because [p]laintiffs fail to allege that each

specific director knew or should have known that the manufacturing defects at the various plants, or the problems with the orthopedic devices, constituted actual violations of law, [p]laintiffs fail to satisfy the [*Caremark*] formulation of the [Federal] Rule 23.1 pleading standard.").

Here, Plaintiff has failed to allege that Director Defendants knew about either the GDA finding or FDA complaint. Moreover, Plaintiff appears to concede that Director Defendants were "never apprised" of information contained in the FDA complaint. (*See* Doc. 2 at ¶ 46). The paucity of these allegations is only "more glaring" following Plaintiff's receipt of Section 220 documents. *See Horman*, 2017 WL 242571, at *12. Thus, Plaintiff's failure to allege particularized facts about Director Defendants' knowledge of either the GDA finding or FDA complaint does not satisfy the Federal Rule 23.1 pleading standard.

### iii.    April 23, 2015 Recall

Plaintiff's final proffered red flag is the April 23, 2015 Recall. On April 22, 2015, Inventure's Board was provided "an overview of the events leading up to and arising" from a various FDA and GDA inspections of the Jefferson Facility. (Doc. 2 at ¶ 48). Following this discussion, Inventure's Board approved the next-day issuance of a press release that announced the initiation of a recall for food manufactured in the Jefferson Facility "due to the Jefferson Facility testing positive for Listeria." (*Id.* at ¶¶ 48–49). The Complaint lacks any particularized allegations regarding any individual Director Defendant's bad faith following the Recall. Instead, Plaintiff argues that bad faith can be inferred because Director Defendants "merely receiv[ed] information and then [did] nothing in response [to the Recall] to address known issues." (Doc. 35 at 23).

Plaintiff cites to four cases to argue that the Court may infer Director Defendants acted in bad faith despite Plaintiff's failure to plead particularized facts demonstrating such. First, in *Westmoreland County Employee Retirement System v. Parkinson*, a company entered into a consent decree requiring investment in remedial measures after the FDA discovered a "range of defects" with the company's medical device.

727 F.3d 719, 722 (7th Cir. 2013). Despite persistent problems with the medical device, the CEO publicly announced that the company was focusing on a new product and revising its implementation timeline of remedial measures in light of a reassessment in how the company would "allocate [its] promotional focus in [] resources." *Id.* at 723. In response, the FDA ended the remedial efforts and ordered the company to reimburse customers for the value of the recalled device, among other sanctions. *Id.* at 723–24. The Seventh Circuit Court of Appeals (the "Seventh Circuit") held that the plaintiffs provided a reasonable basis to infer bad faith based on the board's belief that it did not need to follow the orders of the FDA if it could develop a new product before the FDA realized that the company had stopped attempting to remedy defects in its older product. *Id.* at 729.

Similarly, in *In re Massey Energy Company*, "[t]he company's CEO . . . 'believ[ed] he knew better about how to run mines safely than the' government agency charged with regulating mine safety and 'publicly stated that the idea that governmental safety regulators knew more about mine safety than he did was silly.'" *Melbourne*, 2016 WL 4076369, at *10 (quoting *In re Massey*, C.A. No. 5430-VCS, 2011 WL 2176479, at *18–19 (Del. Ch. May 31, 2011)). As a result, the Court of Chancery of Delaware found a reasonable basis to infer the board acted in bad faith by continuously undermining the federal safety regulators. *In re Massey*, 2011 WL 2176479, at *19.

Here, unlike the plaintiffs in *Parkinson* or *In re Massey*, Plaintiff has failed to provide any allegations involving adversarial tactics by Director Defendants against a regulatory agency. The Complaint even indicates that following the Recall, "the GDA inspected the Jefferson Facility and reported that all violations had been corrected as of" June 23, 2015. (Doc. 2 at ¶ 50). Plaintiff instead asks this Court to infer bad faith based on the occurrence of later food safety violations rather than any particularized allegations regarding individual Director Defendants. Delaware courts have continuously rejected this shortcut in pleading demand futility. *See Desimone v. Barrows*, 924 A.2d 908, 940

(Del. Ch. 2007) ("Delaware courts routinely reject the conclusory allegation that because illegal behavior occurred, internal controls must have been deficient, and the board must have known so."); *see also, e.g.*, *In re Qualcomm Inc. FCPA Stockholder Derivative Litig.*, C.A. No. 11152-VCMR, 2017 WL 2608723, at *4 (Del. Ch. June 16, 2017) ("A corporation's violation of the FCPA alone is not enough for director liability under *Caremark*."). Thus, *Parkinson* and *In re Massey* are distinguishable from this case.

Plaintiff also cites *Louisiana Municipal Police Employees' Retirement System v. Pyott* in arguing that bad faith is inferable based on Plaintiff's allegations. In *Pyott*, a company's general counsel advised the board that the company had likely engaged in illegal conduct by marketing Botox for off-label use. 46 A.3d 313, 320 (Del. Ch. 2012). Despite the general counsel's warnings, "the [b]oard discussed and approved a series of annual strategic plans that contemplated expanding Botox sales dramatically within geographic areas that encompassed the United States" and that those "plans contemplated new markets for Botox that involved applications that were off-label uses in the United States." *Id.* at 352. The Court of Chancery of Delaware concluded that "a reasonable inference can be drawn from particularized allegations of the Complaint and the documents it incorporates by reference that the [b]oard knowingly approved and subsequently oversaw a business plan that required illegal off-label marketing and support initiatives for Botox." *Id.* at 356. Thus, the *Pyott* court inferred bad faith based on the board's alleged decision to *cause* the company to engage in illegal conduct. *Id.* Here, unlike the plaintiffs in *Pyott*, Plaintiff alleges that the board acted in bad faith by consciously disregarding its duty to *prevent* Inventure from violating food safety regulations. (*See* Doc. 2 at ¶ 77). As such, *Pyott* does not support an inference of bad faith in this case. *See In re Qualcomm*, 2017 WL 2608723, at *4 (distinguishing *Pyott* on this basis); *see also Melbourne*, 2016 WL 4076369, at *12 (same). Further, even if Plaintiff's allegations matched those in *Pyott*, Plaintiff has failed to allege any particularized allegations indicating that Inventure's Board knowingly caused the company to violate FDA and GDA regulations.

Finally, Plaintiff argues that the Court can infer bad faith from the Complaint's allegations based on *In re Abbott Laboratories Derivative Shareholders Litigation*. (Doc. 35 at 23). In *In re Abbott*, the Seventh Circuit found that "six years of noncompliance, inspections, [FDA Form] 483s, Warning Letters, and notices in the press, all of which then resulted in the largest civil fine ever imposed by the FDA and the destruction and suspension of products which accounted for approximately $ 250 million in corporate assets," indicated that the directors acted in bad faith. 325 F.3d 795, 809 (7th Cir. 2003). Here, no such allegations of ample red flags exist. Plaintiff's allegations in the Complaint are limited to bare assertions that: (i) Director Defendants were aware of the Recall, and (ii) because another Listeria outbreak occurred at the Jefferson Facility, Director Defendants must have acted in bad faith following the Recall. Without any additional particularized allegations, the Court is unable to infer bad faith based on Director Defendants' conduct. *See, e.g.*, *South v. Baker*, 62 A.3d 1, 18 (Del. Ch. 2012) ("But three mining accidents in a year does not support a reasonable inference of board involvement, much less bad faith, conscious wrongdoing, or knowing indifference on the part of a board of directors" without additional, particularized allegations.). Plaintiff has failed to plead particularized facts from which the Court can reasonably infer that Director Defendants acted in bad faith. The Court concludes that Plaintiff has failed to raise doubt that Director Defendants did not breach their fiduciary duty in overseeing Inventure's operations, and, thus, demand is not excused on the bases Plaintiff has advanced.

## 2. Section 14(a) Demand Futility

Plaintiff alleges that demand is excused on his Section 14(a) claim because Director Defendants face a substantial likelihood of personal liability for issuing false or misleading proxy statements. (Doc. 2 at ¶ 76). Defendants argues the following: (1) the Section 14(a) claims relating to the 2015 Proxy Statement are barred by the statute of limitations; (2) the proxy statements contained no material misrepresentations or omissions; (3) Plaintiff has failed to allege culpability; and (4) Plaintiff failed to establish

an "essential link" between the proxy statement and any damages. (Doc. 38 at 9–12).

Section 14(a) prohibits the solicitation of proxy votes "in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78n(a).[9] SEC Rule 14a-9 prohibits solicitations "containing any statement which . . . is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 383 (1970); 17 C.F.R. § 240.14a-9(a) (2016).

To state a claim under Section 14(a) and Rule 14a-9, a plaintiff must establish that "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *N.Y.C. Emples.' Ret. Sys. v. Jobs*, 593 F.3d 1018, 1022 (9th Cir. 2010) (citing *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 228 (3d Cir. 2007)), *overruled in part on other grounds by Lacey v. Maricopa Ct.*, 693 F.3d 896, 928 (9th Cir. 2012) (en banc). Under the Private Securities Litigation Reform Act, a Section 14(a) claim must be pled with particularity. The required state of mind for a Section 14(a) claim is negligence, however, not knowledge or deliberate recklessness. *See In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1267 (N.D. Cal. 2000). Thus, plaintiffs must plead particularized facts that give rise to a strong inference of negligence. *Id.*

### a.    Statute of Limitations

Director Defendants argue that Plaintiff's Section 14(a) claims related to the 2015 Proxy Statement, which was filed on April 21, 2015, are barred by the statute of limitations. (Doc. 33 at 21). Plaintiff argues that he did not discover "facts constituting

---

[9] The Court notes that the same Delaware demand futility requirement stated earlier applies to the Section 14(a) claim despite the claim being brought under a federal statute. *See In re CNET Networks, Inc. S'holder Derivative Litig.*, 483 F. Supp. 2d 947, 966 (N.D. Cal. 2007); *see also In re Comput. Scis. Corp. Derivative Litig.*, No. C06-794RSL, 2007 WL 2476278, at *14 (W.D. Wash. Aug. 6, 2007).

the violation" until "he received documents in response to his inspection demand in September 2016," or less than a year before the March 9, 2017 filing of the Complaint. (Doc. 35 at 30).

"The limitations period for a [Section] 14(a) claim is 'one year after the plaintiff discovers the facts constituting the violation, and in no event more than three years after such violation.'" *In re VeriSign, Inc., Derivative Litig.*, 531 F. Supp. 2d 1173, 1212 (N.D. Cal. 2007) (quoting *Westinghouse Elec. Corp. by Levit v. Franklin*, 993 F.2d 349, 353 (3d Cir. 1993)). The statute of limitations for claims is triggered "when the plaintiff has actual knowledge of the fraud or knowledge of facts sufficient to put a reasonable person on notice." *In re Syntex Corp. Sec. Litig.*, 855 F. Supp. 1086, 1099 (N.D. Cal. 1994) (citations omitted) (referring to the statute of limitations for claims under Section 10(b)); *see Westinghouse*, 993 F.2d at 353–54 (holding that Section 14(a) and Section 10(b) claims are similar for statute of limitations purposes).

Here, although Plaintiff claims that he could not have been put on "notice" until after he received documents from his Section 220 demand, the Court disagrees. Inventure filed its 2015 Proxy Statement on April 21, 2015. (Doc. 2 at ¶ 57). A few days later, on April 23, 2015, Inventure announced the Recall. (*Id.* at ¶ 49). The bases for Plaintiff's Section 14(a) claims include the Inventure Board's level of oversight, whether Inventure complied with various food safety regulations, the state of repair of the Jefferson Facility, and details regarding Inventure's food safety controls. (*Id.* at ¶¶ 58–59). The Recall itself sufficed to put "a reasonable person on notice" as to whether the statements in the 2015 Proxy Statement were false—or, at the very least, misleading. While the documents Plaintiff received in September 2016 may have confirmed the presence—or lack thereof—of reporting controls, the receipt of these documents was not the incident that put Plaintiff "on notice." Because the Plaintiff was put "on notice" on April 23, 2015 and waited over one year to file his Complaint on March 9, 2017, the Section 14(a) claims related to the 2015 Proxy Statement are time barred.

### b. Misstatement

Plaintiff alleges that Inventure's 2016 Proxy Statement contained material misstatements and omissions. (*Id.* at ¶¶ 62, 63, 83). The Ninth Circuit Court of Appeals has held that federal securities laws do not contain a "freestanding completeness requirement." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (analyzing Sections 10(b) and 14(e)); *see also In re Textainer P'ship Sec. Litig.*, No. C-05-0969 MMC, 2005 WL 3801596, at *8 (N.D. Cal. Dec. 12, 2005) (applying *Brody* in the Section 14(a) context). Thus, a "complaint must *specify* the reason or reasons why the statements made by [the defendants] were *misleading* or *untrue*, not simply why the statements were *incomplete*." *Brody*, 280 F.3d at 1006 (emphasis added).

Here, Plaintiff alleges that two statements in the 2016 Proxy Statement were misleading:

> 1.      "It is management's responsibility to manage risk and bring to the Board of Directors' attention the most material risks to the Company, but the Board of Directors has oversight responsibility of the processes established to report and monitor systems for material risks applicable to the Company." (Docs. 2 at ¶ 63; 33-4 at 14).
>
> 2.      "The full Board of Directors considers strategic risks and opportunities and regularly reviews enterprise-wide risk management, including food safety, internal controls, compliance and ethics, insurance, and operations." (Docs. 2 at ¶ 63; 33-4 at 14).

Plaintiff provides no allegations stating why these statements were false or misleading.[10] Indeed, nowhere in the Complaint does Plaintiff allege that the Inventure's Board did not have oversight responsibility. By failing to explain how either statement was false or misleading—and failing to provide supporting allegations that would support why either statement was false or misleading—Plaintiff has failed to allege a Section 14(a) claim.

Even if Plaintiff provided a basis for why the second statement was false or

---

[10] To the extent Plaintiff believes the first statement suggests that Inventure's Board "maintained adequate oversight," (Doc. 2 at ¶ 63), Plaintiff has failed to cite to language describing the oversight as adequate. The Court does not read the sentence as ensuring "adequate" oversight and, thus, disregards Plaintiff's subjective characterization of the sentence.

misleading, that statement is inactionable puffery. Statements are not actionable if they are "generalized, vague and unspecific assertions, constituting mere 'puffery' upon which a reasonable consumer could not rely." *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 379 (9th Cir. 2003) (citing *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242 (9th Cir. 1990)). As a result, "[t]o be misleading, a statement must be 'capable of objective verification.'" *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017) (quoting *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014)). Here, the statement that the Inventure Board "regularly reviews" various aspects of Inventure's operations does not provide a specific representation of an objective fact. *See, e.g.*, *XYZ Two Way Radio Serv., Inc. v. Uber Techs., Inc.*, 214 F. Supp. 3d 179, 184 (E.D.N.Y. 2016) (holding that a statement that "Uber regularly reviews that feedback" falls "within one or more of the accepted definitions of puffery"). Thus, even if Plaintiff provided a basis for why the second identified statement was false or misleading, it is inactionable as mere puffery.

Finally, Plaintiff alleges that the 2016 Proxy Statement omitted information regarding:

> (i) significant deficiencies in Inventure's food safety controls; (ii) the Company's past and continuing non-compliance with USDA and FDA rules and regulations concerning food safety; (iii) the significant reporting failures that failed to timely apprise the Board of serious food safety concerns at the Jefferson Facility; and (iv) the Board's continuing failure to ensure that the Company timely and adequately addressed and repaired the Jefferson Facility.

(Doc. 2 at ¶ 63). Plaintiff does not allege what statements in the 2016 Proxy Statement were rendered false or misleading by the omission of the above-stated information.

Under Section 14(a), disclosure is required "to make the statements therein [the proxy statement] not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading." 17 C.F.R. § 240.14a-9. In other

words, "a plaintiff cannot simply allege that an omission was material to properly allege falsity; rather, plaintiffs must show that the omission actually renders *other* statements misleading." *Lomingkit v. Apollo Educ. Grp. Inc.*, No. CV-16-00689-PHX-JAT, 2017 WL 633148, at *11 (D. Ariz. Feb. 16, 2017) (citing *In re Rigel Pharms.*, 697 F.3d 869, 880 n.8 (9th Cir. 2012)). Alternatively, various statutes or regulations may create an affirmative duty to disclose information even when no statements made by a defendant are false or misleading. *See, e.g.*, 17 C.F.R. § 240.14a-101 (2016) (listing additional information required to be in a proxy statement pursuant to Section 14(a)).

Here, Plaintiff has failed to allege how disclosure of the four omitted pieces of information would cure any specific false or misleading statement in the 2016 Proxy Statement. Without identifying statements that are false or misleading or why omitted information is required to be disclosed, Plaintiff has failed to meet his pleading burden under Section 14(a). *See Lomingkit*, 2017 WL 633148, at *11 ("It is not the Court's responsibility to determine why each statement was false and misleading, potentially giving rise to [the d]efendants' duty to disclose additional information.").

### c.    State of Mind and Essential Link

Because falsity and state of mind are often treated as a single inquiry, and Plaintiff has failed to adequately allege that Director Defendants made a false or misleading statement, the Court does not address negligence. *See In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043, 1077 (C.D. Cal. 2012). Similarly, having agreed with Defendants that Plaintiff has failed to allege any false or misleading statements, the Court will not reach Defendants' essential link argument at this time.

### 3.    Breach of Director Defendants' Duty of Loyalty

Plaintiff's other argument as to demand futility claims that demand would be futile against Inventure's Board because Director Defendants face a substantial likelihood of liability for breaching their fiduciary duty of loyalty by making false and misleading statements. (Doc. 2 at ¶¶ 76, 77). In particular, Plaintiff alleges that Director Defendants made false or misleading statements or omissions in Inventure's 2013 Form 10-K, 2014

Form 10-K, 2015 Form 10-K, Offering Documents, 2015 Proxy Statement, and 2016 Proxy Statement. (*See id.* at ¶¶ 52–64, 75–79, 86–92).

Directors' fiduciary duties of care and loyalty give rise to a related duty "to observe proper disclosure requirements." *Malone v. Brincat*, 722 A.2d 5, 12 (Del. 1998); *see also RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816, 858 (Del. 2015) ("The [b]oard's fiduciary duty of disclosure, like the board's duties under *Revlon* and its progeny, is not an independent duty but the application in a specific context of the board's fiduciary duties of care, good faith, and loyalty." (quotation marks and alterations omitted)). "To state a claim for breach of the fiduciary duty of disclosure on the basis of a false statement or representation, a plaintiff must identify (1) a material statement or representation in a communication contemplating stockholder action (2) that is false." *Pfeffer v. Redstone*, 965 A.2d 676, 685 (Del. 2009) (quotation marks omitted). Similarly, a director may breach the fiduciary duty of disclosure by omitting material information. *See Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840, 846 (Del. 1987) (discussing the pleading requirements for actionable omissions).

"Under Delaware law, as under federal law, the materiality standard requires 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *In re Sauer-Danfoss Inc. S'holders Litig.*, 65 A.3d 1116, 1127–28 (Del. Ch. 2011) (quoting *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985)). "The 'total mix' of information includes information already in the public domain and facts known or reasonably available to the shareholders." *Rodman v. Grant Found.*, 608 F.2d 64, 70 (2d Cir. 1979) (quotation marks omitted). "The determination of materiality is case specific, and [Delaware] courts have recognized that a board's disclosure obligation is not boundless, and that the board need not disclose information simply because it might be helpful." *In re Paramount Gold & Silver Corp. Stockholders Litig.*, C.A. No. 10499-CB, 2017 WL 1372659, at *9 (Del. Ch. Apr. 13, 2017) (quotation marks and citations omitted).

Here, the Court finds that each of Plaintiff's alleged misstatements or omissions suffers from one or more of the following deficiencies: (1) the statements are not material; (2) the statements are not false or misleading; (3) the omissions are not material; and (4) Plaintiff has failed to allege the required culpability related to Director Defendants' purportedly misleading omissions. The Court will analyze each of Plaintiff's identified statements as they fall within each deficiency.

### a. Non-Actionable Puffery

Defendants argue that a number of Plaintiff's identified statements are not actionable because they are "devoid of any substantive information" and, thus, not material. (Docs. 38 at 7; 33 at 16). Plaintiff does not specifically address this argument but, rather, states that "[i]t cannot be said on this motion that Plaintiff fails to plead materiality." (Doc. 35 at 25 n.20).

As the Court noted earlier in this Order, a statement that is merely puffery is not material. *See, e.g.*, *City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. Comstock*, C.A. No. 9980-CB, 2016 Del. Ch. LEXIS 133, at *40 n.55 (Del. Ch. Aug. 24, 2016) (discussing whether a statement is "immaterial puffery" and, thus, not actionable under Delaware law). Here, the Court agrees with Defendants that at least one of Plaintiff's identified statements is too vague or generalized to be "capable of objective verification." *Apollo Grp.*, 774 F.3d at 606.

Plaintiff alleges Inventure's Offering Documents contained the following misleading statement:

> "Inventure's six purported 'state-of-the-art' facilities utilized 'advanced manufacturing capabilities' which provided the Company with 'competitive strengths [that] differentiate [Inventure] from [its] competitors and contribute to [the Company's] continued success." (Doc. 2 at ¶ 55 (alterations in original)).[11]

Numerous courts have held that terms like "state-of-the-art," "advanced capabilities,"

---

[11] The Offering Documents are not part of the Court's record. Thus, the Court will assume this statement appears in the Offering Documents as-alleged.

"competitive strengths," and "differentiation" are mere puffery. *See, e.g.*, *Cheatham v. ADT Corp.*, 161 F. Supp. 3d 815, 829 (D. Ariz. 2016) (holding that statements about "technological sophistication . . . are too far removed from any specific or absolute characteristics of its product to be actionable." (quotation marks and alterations omitted)); *Soilworks, LLC v. Midwest Indus. Supply, Inc.*, 575 F. Supp. 2d 1118, 1133 (D. Ariz. 2008) ("Courts have also held that 'the generalized and vague statements of product superiority such as . . . 'more innovative than competing machines' are non-actionable puffery.'" (quoting *Oestreicher v. Alienware Corp.*, 544 F. Supp. 2d 964, 973 (N.D. Cal. 2008))). Indeed, Plaintiff's identified statement fails to objectively discuss any aspect of Inventure's "advanced manufacturing capabilities" or "competitive strengths" that would provide any measurable basis for this Court to determine whether the statement is false or misleading. *See, e.g.*, *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671 (6th Cir. 2005) (classifying as puffery statements that "are too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision"). Thus, Plaintiff's identified statements regarding the advanced or technological nature of Inventure's facilities are immaterial puffery and not actionable.[12]

### b. Falsity or Misleading Nature of Identified Statements

Plaintiff identifies the following two statements as false or misleading[13]:

> (1)   "The manufacture, labeling and distribution of our products are subject to the rules and regulations of a variety of federal, state, and other governmental agencies. . . . We believe that we presently comply in all material respects with such laws and regulations." (Doc. 2 at ¶ 52).

> (2)   "We also believe that our properties generally are in good operating condition and are suitable for our current

---

[12] The Court's analysis of Plaintiff's identified statement about the Inventure Board "regularly review[ing]" various aspects of Inventure's operations applies with equal force to Plaintiff's fiduciary duty claims as it did to Plaintiff's Section 14(a) claims. *See supra* Section III.A.2.b. Thus, the "regularly reviews" statements in Inventure's 2015 Proxy Statement and 2016 Proxy Statement are mere puffery and not actionable.

[13] These statements appear in Inventure's 2013 Form 10-K, 2014 Form 10-K, 2015 Form 10-K, and Offering Documents. (Doc. 2 at ¶¶ 52–54).

purposes." (*Id.*).

Plaintiff appears to ask the Court to ignore the "we believe" prefacing both statements and, instead, presume that both statements stated an objective fact rather than a subjective belief. (*See id.* at ¶ 52 (alleging that the statements "misrepresented that Inventure actually complied with such rules and regulations" and "touted that all of Inventure's properties were in 'good operating condition and are suitable for [the company's] current purposes'")). In the context of opinion statements, the U.S. Supreme Court has recognized that a plaintiff must allege both that "the speaker did not hold the belief she professed" and that the belief is objectively untrue. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1327 (2015). Plaintiff has failed to allege that Director Defendants did not genuinely hold their stated beliefs and, thus, has not alleged that the statements were false or misleading.[14]

Next, for the reasons the Court recounted when analyzing Plaintiff's Section 14(a) claims, Plaintiff has failed to allege that the two statements in Inventure's 2015 Proxy Statement and 2016 Proxy Statement are false or misleading. In particular, Plaintiff failed to allege that Director Defendants did not have oversight responsibility or considered "strategic risks and opportunities and regularly review[ed] enterprise-wide risk management." (Doc. 2 at ¶ 58). Thus, Plaintiff has failed to allege that Director Defendants made a false or misleading statement in the 2015 and 2016 Proxy Statements.

### c. Omissions

Finally, Plaintiff alleges that Director Defendants breached their fiduciary duty of loyalty by misleadingly omitting various pieces of information, including the following:

---

[14] To the extent that Plaintiff relies on a theory of omission relating to opinion statements, *see, e.g.*, *Omnicare*, 135 S. Ct. at 1329 (noting that if a company's filing "omits material facts about the [board's] inquiry into or knowledge concerning a statement of opinion," such omission could be the basis for liability), Plaintiff must allege "facts going to the basis for [Director Defendants'] opinion—facts about the inquiry the [Director Defendants] did or did not conduct or the knowledge [they] did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context," *id.* at 1332. This analysis is analogous to the Court analysis of Plaintiff's claims that Director Defendants misleadingly omitted information regarding Inventure's regulatory compliance. *See infra* Section III.A.3.c.

1)    The failure "to comply with the USDA's and FDA's standards for manufacturing food and preventing contamination from the growth of Listeria and other microorganisms" was omitted from Inventure's 2013 Form 10-K, 2014 Form 10-K, 2015 Form 10-K, Offering Documents, 2015 Proxy Statement, and 2016 Proxy Statement. (Doc. 2 at ¶¶ 53, 55, 59, 63).

2)    "[S]ignificant deficiencies in Inventure's food safety controls" were omitted from Inventure's 2015 Proxy Statement and 2016 Proxy Statement. (*Id.* at ¶¶ 59, 63).

3)    "[T]he significant reporting failures that failed to timely apprise the Board of serious food safety concerns at the Jefferson Facility" were omitted from Inventure's 2015 Proxy Statement and 2016 Proxy Statement. (*Id.*).

4)    "[T]he Board's continuing failure to ensure that the Company timely and adequately addressed and repaired the Jefferson Facility" was omitted from Inventure's 2015 Proxy Statement and 2016 Proxy Statement. (*Id.*).

"To state a claim for breach by omission of any duty to disclose, a plaintiff must plead facts identifying (1) material, (2) reasonably available (3) information that (4) was omitted from the proxy materials." *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 926 (Del. Ch. 1999) (citations omitted). An omission is actionable if it "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available." *Klang v. Smith's Food & Drug Ctrs., Inc.*, 702 A.2d 150, 156 (Del. 1997). Further, to breach the duty of disclosure, a director must "intentionally omit[] material information or knowingly disseminate[] false information." *Goodwin v. Live Entm't, Inc.*, No. Civ.A. 15765, 1999 WL 64265, at *7 (Del. Ch. Jan. 25, 1999) (citing *Malone*, 722 A.2d at 9); *see also In re Citigroup*, 964 A.2d at 134–35 (holding that demand was not futile where the "Complaint does not sufficiently allege that the director defendants had knowledge that any disclosures or omissions were false or misleading or that the director defendants acted in bad faith in not adequately informing themselves."); *Redstone*, 965 A.2d at 686–87 ("When pleading a breach of fiduciary duty based on the [directors'] knowledge, [a plaintiff] must, at a minimum, offer' well-pleaded facts from which it can reasonably inferred that this 'something' was knowable and that the defendant was in a position to know it.'" (quoting *IOTEX*

*Commc'ns, Inc. v. Defries*, C.A. No. 15817, 1998 WL 914265, at *4 (Del. Ch. Dec. 21, 1998))). Here, Plaintiff has failed to allege that any identified omission would have "significantly altered the 'total mix' of information available" and/or that Director Defendants knowingly omitted any of the identified information.

Although Plaintiff alleges that Director Defendants should have disclosed various pieces of information in Inventure's filings, Plaintiff has neglected to plead that Director Defendants actually knew of much of the omitted information at the time each document was filed. For example, of all of the alleged FDA or GDA violation findings, Plaintiff only alleges that Director Defendants knew about the one following the April 17, 2015. (*See* Doc. 2 at ¶¶ 45 (failing to allege that Director Defendants knew about the GDA's October 22, 2014 findings); 46 (stating that Director Defendants "apparently [were] never apprised" of a complaint filed with the FDA on March 2, 2015); 51 (failing to allege that Director Defendants were aware of the GDA's findings from July 1, 2015)). Further, with regard to the FDA and GDA Joint Inspection occurring on April 17, 2015, Plaintiff has failed to allege when the FDA and GDA notified Director Defendants of their findings and, importantly, whether Director Defendants were aware of the findings before the 2015 Proxy Statement was filed on April 21, 2015. (*See* Doc. 2 at ¶ 47). Instead, Plaintiff alleges that Director Defendants knew about the FDA and GDA findings one day later, on April 22, 2015, and Director Defendants issued a press release disclosing those findings on April 23, 2015. (*Id.* at ¶¶ 48, 49). Thus, Plaintiff has failed to allege that Director Defendants "intentionally omitted material information" regarding regulatory violations when filing Inventure's 2013 Form 10-K, Offering Documents, 2014 Form 10-K, and 2015 Proxy Statement.[15]

Similarly, Plaintiff has failed to allege that Director Defendants "intentionally omitted material information" regarding regulatory violations when filing Inventure's

---

[15] To the extent Plaintiff is arguing that Director Defendants were under an obligation to disclose regulatory violations that occurred at the Jefferson Facility "several years prior to Inventure's acquisition," (Doc. 2 at ¶ 44), the Court does not see—and Plaintiff has not argued—how violations reaching back several years under different management would be material information that Director Defendants must disclose.

2015 Form 10-K and 2016 Proxy Statement. Although Plaintiff alleges that neither filing addresses the FDA and GDA findings from their joint inspection, Director Defendants had disclosed those findings in the April 23, 2015 press release. Thus, repeating the disclosure of that information would not have altered the "total mix" of information available at the time. *See, e.g.*, *In re Cytec Corp.*, No. Civ.A. 02-12399-NMG, 2005 WL 3801468, at *23 (D. Mass. Mar. 2, 2005) ("In addition, the nondisclosure of the use of discounts did not significantly alter the total mix of information inasmuch as the 2000 Form 10-K filing discloses the use of such discounts."). Further, Plaintiff failed to allege that Director Defendants were aware of the July 1, 2015 GDA finding before filing the 2015 Form 10-K and 2016 Proxy Statement, and Plaintiff has not alleged any other regulatory findings before those documents were filed. (Doc. 2 at ¶ 51). Therefore, Plaintiff has failed to allege that Director Defendants breached their fiduciary duty of loyalty by omitting material information related to FDA or GDA regulatory noncompliance in any public filing.

Finally, with regard to the three pieces of information Plaintiff alleges was omitted from the 2015 Proxy Statement and 2016 Proxy Statement, Plaintiff's pleading regarding the omitted information is too vague to be material. Plaintiff uses terms like "significant deficiencies in . . . food safety controls," "significant reporting failures," and "continuing failure to . . . timely and adequately address[] and repair[] the Jefferson Facility." (Doc. 2 at ¶¶ 59, 63). These pieces of omitted information are too vague to be material. *See Glen Holly*, 352 F.3d at 379 (classifying as inactionable puffery statements that are "generalized, vague and unspecific").

Plaintiff's attempts to specify the exact pieces of information omitted from the two proxy statements also fails. For example, in discussing the information omitted from the 2015 Proxy Statement, Plaintiff appears to allege that Director Defendants should have disclosed that they did not learn of the unsanitary conditions "until the day before the Recall." (Doc. 2 at ¶ 59). However, the 2015 Proxy Statement was filed two days before the Recall. (Doc. 2 at ¶ 57). Thus, Plaintiff asserts that the 2015 Proxy Statement should

have included information that was unavailable to Director Defendants until after the 2015 Proxy Statement was filed. Similarly, in elaborating on the information omitted from the 2016 Proxy Statement, Plaintiff references information revealed "two months after the 2016 Proxy was filed." (Doc. 2 at ¶ 63). Thus, the three pieces of information allegedly omitted from the 2015 Proxy Statement and 2016 Proxy Statement does not give rise to liability because it is too vague to be material and/or refers to information relating to events that occurred after each statement was filed.

### 4. Corporate Waste and Unjust Enrichment Claims

Plaintiff finally argues that demand is excused as to his claims of corporate waste and unjust enrichment because Director Defendants face a substantial likelihood of liability under each claim. (Doc. 35 at 26).[16]

Where a plaintiff's theory for claims like corporate waste or unjust enrichment are the same as the theory for a breach of fiduciary duty, such that each "claim depends *per force* on the breach of fiduciary duty claim," courts often "treat[] [those claims] in the same manner when resolving a motion to dismiss." *Frank v. Elgamal*, C.A. No. 6120-VCN, 2014 WL 957550, at *31 (Del. Ch. Mar. 10, 2014).

Here, Plaintiff's claims rely on the viability of Plaintiff's breach of fiduciary duty claims. (*See* Doc. 2 at ¶¶ 94 (premising the corporate waste claim on "the wrongdoing alleged herein and . . . fail[ure] to conduct proper supervision); 98 (premising the unjust enrichment claim on "the compensation and director remuneration . . . [Defendants] received while breaching fiduciary duties owed to Inventure")). Because this Court has held that demand was required before Plaintiff brought his breach of fiduciary duty and Section 14(a) claims, demand is similarly required on the derivative corporate waste and unjust enrichment claims.

*///*

---

[16] The Court notes that the Complaint does not actually address why demand would be futile as to these two claims. (*See* Doc. 2 at ¶¶ 75–79). Rather, the Complaint appears to rely on the inference that if Director Defendants are liable for breaching their fiduciary duties, they are liable for claims deriving from those breaches, including the claims of corporate waste and unjust enrichment. (*See, e.g.*, *id.* at ¶¶ 94, 98).

## 5. Demand Futility as a Whole

Having assessed each of Plaintiffs' allegations standing alone, Delaware law requires the Court to determine "whether the totality of Plaintiff['s] allegations demonstrates a reasonable doubt about the Board's impartiality." *In re Bidz.com, Inc. Derivative Litig.*, 773 F. Supp. 2d 844, 860–61 (C.D. Cal. 2011) (citing *Harris v. Carter*, 582 A.2d 222, 229 (Del. Ch. 1990)). Plaintiff's allegations in the Complaint largely attempt to plead that Director Defendants acted in-concert in breaching their individual fiduciary duties. Even more difficult, Plaintiff frequently asks the Court to infer bad faith from either the lack of evidence or unsuspicious conduct. Plaintiff's failure to allege culpability on a director-by-director basis or particularized facts that support an inference of bad faith as to a majority of directors on Inventure's Board requires this Court to find that Plaintiff has failed to allege demand futility with particularity as to any of his five claims for relief. *See, e.g.*, *In re Capital One Derivative S'holder Litig.*, 952 F. Supp. 2d 770, 796 (E.D. Va. 2013) (requiring a plaintiff to "allege particularized facts with respect to each director that would demonstrate that the director had knowledge of the red flags and failed to heed the warnings provided by the red flags in bad faith"); *In re Citigroup, Inc. S'holders Litig.*, Civ.A. No. 19827, 2003 WL 21384599, at *1–3 (Del. Ch. June 5, 2003) (refusing to impute knowledge to a board of alleged red flags without particularized pleading of facts specific to each director).

## IV. MOTION TO DISMISS UNDER FEDERAL RULE 12(b)(6)

Defendants also move to dismiss Plaintiff's claims under Federal Rule 12(b)(6). (Doc. 33 at 13–24). Because the Court finds that demand was required and, thus, grants Defendants' Motion to Dismiss under Federal Rule 23.1, the Court will deny Plaintiff's Motion to Dismiss under Federal Rule 12(b)(6) as moot.

## V. MOTION TO STAY

Defendants finally move to stay "in the event the Court allows this matter to proceed into discovery." (*See* Doc. 33 at 24–26). Because the Court grants Defendants' Motion to Dismiss, the Court will deny Defendants' Motion to Stay as moot.

## VI.   LEAVE TO AMEND

Plaintiff's Response includes a Request for Leave to Amend if the Court grants Defendants' Motion to Dismiss. (*See* Doc. 35 at 31 n.30). On August 9, 2017, consistent with Local Rule of Civil Procedure 15.1(a), the Court ordered Plaintiff to file a "red-lined version of the proposed amended complaint that he intends to file if the Court were to grant [Defendants'] Motion to Dismiss." (Doc. 43). Plaintiff filed a Redlined Version of the Proposed Amended Complaint on August 25, 2017. (*See* Doc. 47-1).

"Leave to amend should be granted if it appears at all possible that the plaintiff can correct the defect." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000). But "[a] district court may dismiss a complaint without leave to amend if amendment would be futile." *Airs Aromatics, LLC v. Op. Victoria's Secret Stores Brand Mgmt., Inc.*, 744 F.3d 595, 600 (9th Cir. 2014) (quotation marks and citations omitted).

Here, Plaintiff's Proposed Amended Complaint contains allegations that, on their face, appear to show that amendment would not be futile. For example, rather than relying solely on the lack of Inventure Board minutes to allege that the Court should infer Director Defendants breached their duty of oversight, Plaintiff provides additional allegations that, taken as true, might allow the Court to infer Director Defendants utterly failed to set up an internal system or controls. (*See* Doc. 47-1 at ¶¶ 93–96). Plaintiff's Proposed Amended Complaint also includes new, allegedly false or misleading statements made by Director Defendants, (*see id.* at ¶ 100), and allegations regarding the failure of Director Defendants to ensure the Jefferson Facility operated with proper licensing, (*see id.* at ¶ 94). Because these allegations do not appear to be futile on the face of the Proposed Amended Complaint, the Court will grant Plaintiff's request for leave to amend.

## VII.   CONCLUSION

Based on the foregoing,

**IT IS ORDERED** granting Defendants' Request for Judicial Notice, (Doc. 34), consistent with the above reasoning.

**IT IS FURTHER ORDERED** granting Defendants' Motion to Dismiss Shareholder Derivative Complaint, (Doc. 33 at 1–13), pursuant to Federal Rule 23.1.

**IT IS FURTHER ORDERED** denying Defendants' Motion to Dismiss Shareholder Derivative Complaint, (Doc. 33 at 13–24), pursuant to Federal Rule 12(b)(6) without prejudice as moot.

**IT IS FURTHER ORDERED** denying Defendants' Alternative Motion to Stay, (Doc. 33 at 24–26), without prejudice as moot.

**IT IS FURTHER ORDERED** granting Plaintiff's Request for Leave to Amend, (Doc. 35 at 31 n.30). Plaintiff is not limited to the amendments made on August 25, 2017. To the extent Plaintiff does not make additional amendments than those made on August 25, 2017, Plaintiff shall file a non-red-lined version of an amended complaint by September 5, 2017 at 5:00 PM. To the extent Plaintiff makes additional amendments than those made on August 25, 2017, Plaintiff shall file both red-lined and non-red-lined versions of an amended complaint by September 5, 2017 at 5:00 PM. Defendants shall file an answer or other response by the times set in the Local Rules of Civil Procedure.

**IT IS FURTHER ORDERED** vacating oral argument scheduled for August 30, 2017 at 4:00 PM. Because the Court grants Plaintiff's Request for Leave to Amend, the Court finds oral argument would be unnecessary regarding Defendants' Motions and Request.

Dated this 28th day of August, 2017.

James A. Teilborg
Senior United States District Judge